**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS (CHICAGO)**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>TEC-AIR, INC.,<br><br>            Debtor. | Chapter 11<br><br>Case No. 17-32273 (JSB) |

**NOTICE OF MOTION**

       **PLEASE TAKE NOTICE** that on **November 7, 2017, at 9:30 a.m. (prevailing Central Time)**, the above-captioned Debtor shall appear before the Honorable Janet S. Baer of the United States Bankruptcy Court for the Northern District of Illinois, or any other judge sitting in her place and stead, at Courtroom 615 in the Everett McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois, and then and there present the **Debtor's Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets; (B) Approving Stalking Horse Bid Protections; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Form and Manner of Notice of Sale, Auction, and Sale Hearing; (E) Establishing Notice and Contract Procedures for the Assumption and Assignment of Assumed Contracts and Assumed Leases; and (F) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale Free and Clear of Liens, Claims, Interests, and Encumbrances; (B) Authorizing the Assumption and Assignment of Executory Contracts and Leases; and (C) Granting Related Relief**, a copy of which is hereby served upon you.

Dated:  October 27, 2017
          Chicago, Illinois

Respectfully submitted,

**CULLEN AND DYKMAN LLP**

/s/ *Michael H. Traison*
S. Jason Teele, Esq.
Nicole Stefanelli, Esq.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 849-0220
Facsimile: (973) 849-2020
steele@cullenanddykman.com
nstefanelli@cullenanddykman.com

- and -

Michael H. Traison, Esq.
175 East Delaware Place
Suite 7011
Chicago, Illinois 60611
Telephone: (312) 860-4230
mtraison@cullenanddykman.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

35011.1 496576v1

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS (CHICAGO)
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| TEC-AIR, INC., | Case No. |
| Debtor. |  |

## DEBTOR'S MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING STALKING HORSE BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING; (E) ESTABLISHING NOTICE AND CONTRACT PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND ASSUMED LEASES; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING THE SALE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES; AND (C) GRANTING RELATED RELIEF

Tec-Air, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed counsel, submits this motion (this "Motion") pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of (i) an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order") (a) approving the bidding procedures attached as Exhibit 1 to the proposed Bidding Procedures Order (the "Bidding Procedures") in connection with the solicitation and acceptance of higher and better bids, pursuant to the asset purchase agreement attached hereto as Exhibit B (the "Stalking Horse APA")[1] between the Debtor and Chatterjee Management Company (the "Stalking Horse Bidder") for the sale (the "Sale") of substantially all

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse APA or the Bidding Procedures, as applicable.

of the Debtor's assets (as defined in the Stalking Horse APA, the "Purchased Assets"); (b) approving the Break-Up Fee and Expense Reimbursement (collectively, the "Stalking Horse Bid Protections"); (c) scheduling a hearing for approval of the Sale (the "Sale Hearing") and setting objection deadlines with respect to the Sale; (d) approving the form of notice of the Sale and related auction (the "Auction") attached as Exhibit 2 to the proposed Bidding Procedures Order (the "Sale Notice"); (e) establishing procedures to determine Cure Costs and deadlines for objections to the potential assumption and assignment of the Assumed Contracts and Assumed Leases; and (f) granting related relief; and (ii) an order, substantially in the form attached hereto as Exhibit C (the "Sale Order") (a) authorizing and approving the Sale free and clear of Encumbrances other than Permitted Encumbrances, with such Encumbrances to attach to the proceeds of the sale (the "Sale Proceeds"); (b) authorizing the assumption and assignment of the Assumed Contracts and Assumed Leases; and (c) granting related relief.  In support of the Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

The consummation of a Sale that will maximize value for the Debtor's estate and ensure the highest possible recovery to the Debtor's creditors is the cornerstone of the Debtor's chapter 11 strategy.  To that end, prior to the Petition Date, the Debtor, through its proposed investment banker and financial advisor, Three Twenty-One Capital Partners, engaged in an extensive marketing process.  The prepetition marketing process resulted in the entry by the Debtor into the Stalking Horse APA, which provides for the Sale of the Purchased Assets for a cash purchase price of $4,000,000, plus the assumption of the Cure Costs and Supplier Obligations up to an aggregate amount of $600,000.  The Debtor and the Stalking Horse Bidder negotiated the terms of the Stalking Horse APA at arm's length, subject to higher or otherwise better offers.

With the Stalking Horse APA in place, the Debtor is prepared to execute the final stage of its sale process, which will include a post-petition marketing process, consistent with the terms of the Stalking Horse APA and the Bidding Procedures. The Debtor seeks to conduct an open, robust and transparent sale process pursuant to which the Successful Bidder will enter into an asset purchase agreement, substantially in the form of the Stalking Horse APA.

The Debtor believes that the proposed Sale will maximize the value of the Debtor's assets for all stakeholders. The proposed Bidding Procedures are designed to promote a competitive and expedient sale process. If approved, the Bidding Procedures will allow the Debtor to solicit and identify bids from potential purchasers that constitute the highest or best offer for the Purchased Assets on a schedule consistent with the deadlines set forth herein, in the Stalking Horse APA, and the Debtor's chapter 11 strategy.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007 and 9008 and the applicable Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules").

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

35011.1 489692v5

4.      The Debtor continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No trustee, examiner or official committee has been appointed in this chapter 11 case.

6.      A more detailed factual background of the Debtor's business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the *Declaration of Robert J. McMurtry in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

## RELIEF REQUESTED

7.      By this Motion, the Debtor seeks the entry of two orders: (i) the Bidding Procedures Order (a) approving the Bidding Procedures (including without limitation the Stalking Horse Bid Protections) in connection with the solicitation and acceptance of higher and better bids for the Sale of the Purchased Assets, (b) scheduling the Sale Hearing and setting objection deadlines with respect to the Sale, (c) approving the Sale Notice, (d) establishing procedures to determine Cure Costs and deadlines for objections to the potential assumption and assignment of the Assumed Contracts and Assumed Leases, and (e) granting related relief; and (ii) the Sale order (a) authorizing and approving the Stalking Horse APA, (b) authorizing the Sale free and clear of Encumbrances other than Permitted Encumbrances, with such Encumbrances to attach to the Sale Proceeds (c) authorizing the assumption and assignment of the Assumed Contracts and Assumed Leases, and (d) granting related relief.

-4-

## A.    The Stalking Horse APA

8.    The following chart summarizes key provisions of the Stalking Horse APA:[2]

| **Purchase Price**<br><br>**Stalking Horse APA § 3.1** | The Purchase Price to be paid by Purchaser to Seller in exchange for the Purchased Assets shall be the sum of the following:<br>    (i)    the amount of the Good Faith Deposit; plus<br>    (ii)    cash in the amount of $3,800,000 (such amount, the "Cash Balance"); plus<br>    (iii)    the Cure Costs set forth on Schedule 2.3(a)(i) or as otherwise determined by the Bankruptcy Court, plus the Supplier Obligations set forth on Schedule 2.3(a)(ii) or as otherwise determined by the Bankruptcy Court; provided, however, that Purchaser's obligation to pay the Cure Costs and the Supplier Obligations shall not exceed an aggregate amount of $600,000; plus<br>    (iv)    the assumption by Purchaser of the Assumed Liabilities. |
|---|---|
| **Purchased Assets**<br><br>**Stalking Horse APA § 2.1** | All right, title and interest of Seller in, to or under:<br>(a)    all Accounts Receivable;<br>(b)    the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain Seller's mail and other communications to the extent related to the other Purchased Assets and/or the Assumed Liabilities;<br>(c)    all Inventory;<br>(d)    all Equipment;<br>(e)    all Fixed Assets listed or described on Schedule 2.1(e) (the "Fixed Assets"); provided, however, that the Parties agree that this schedule shall be finalized prior to the Closing and that they will cooperate with one another in order to cause this schedule to be finalized; provided further, however, that this schedule shall include, without limitation, the assets listed in the Impact Solutions Software List, the Impact Solutions Asset Summary Report, the Tec Air Proprietary Tools List, the Selden Fox 2016 List (excluding assets highlighted in yellow), and the Injection Molding/Robot + Other Equipment List.<br>(f)    all Contracts listed or described on Schedule 2.1(f) (the "Assumed Contracts");<br>(g)    all Leases of Leased Real Property listed or described on Schedule 2.1(g), including any improvements to such Leased Real Property (such Leases, the "Assumed Leases"); |

---

[2]    To the extent that there is any inconsistency between the terms of the Stalking Horse APA and the summary of such terms in this Motion, the terms of the Stalking Horse APA shall control.

(h)    the Permits set forth on Schedule 2.1(h) and pending applications therefor, in each case to the extent assignable;

(i)    all Intellectual Property (including all goodwill associated therewith);

(j)    all products and services currently marketed or sold by Seller, including all products in development by Seller;

(k)    all Documents except those (i) relating exclusively to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Seller who are not Transferred Employees;

(l)    all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business, to the extent assignable;

(m)    all Purchased Deposits;

(n)    all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability;

(o)    any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Seller against third parties arising out of events occurring prior to the Closing Date, including, all Avoidance Actions, excluding only the rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff that are identified as Excluded Assets in Section 2.2;

(p)    all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(q)    any proprietary rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other product specification documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(r)    all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business; and

(s)    all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Seller related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; provided, however, none of the Parties hereto

-6-

| | |
|---|---|
| | intends that Purchaser, or any of its Affiliates, shall be deemed to be a successor to Seller with respect to Purchased Assets. |
| **Excluded Assets**<br><br>**Stalking Horse APA § 2.2** | (a)      all cash and cash equivalents, including commercial paper, treasury bills, certificates of deposit and other bank deposits of Seller;<br>(b)      all shares of capital stock or other equity interests of Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Seller;<br>(c)      all minute books, stock ledgers, corporate seals and stock certificates of Seller;<br>(d)      all Contracts (and rights thereunder) not listed or described in Schedule 2.1(f) (the "Excluded Contracts");<br>(e)      all Leases (and rights thereunder) not listed or described in Schedule 2.1(g) (the "Excluded Leases");<br>(f)      all rights, claims or causes of action of Seller under the Stalking Horse APA or the Ancillary Documents, including all right, title and interest to the Good Faith Deposit and Cash Balance;<br>(g)      all receivables, rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset or any Excluded Liability;<br>(h)      all insurance policies, including rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies (including all rights to proceeds under insurance policies) relating to claims for losses related exclusively to any Excluded Asset or Excluded Liability to the extent applicable;<br>(i)      all Documents (A) relating exclusively to any Excluded Asset or any Excluded Liability, (B) relating to employees of Seller who are not Transferred Employees, or (C) other books and records that Seller is required by applicable law to retain or that Seller determines are necessary to retain including Tax Returns, financial statements, and corporate or other entity filings (provided, however, that Purchaser shall have, to the extent allowed by applicable law, the right to make copies of any portions of such retained books and records that relate to the Business, the Purchased Assets or the Assumed Liabilities);<br>(j)      all deposits or prepaid charges and prepaid expenses paid relating exclusively to any of the other Excluded Assets or any Excluded Liability;<br>(k)      all reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;<br>(l)      all assets located at Seller's principal place of business which are not owned by Seller, including the Customer Assets set forth on Schedule 2.2(l); and |

| | |
|---|---|
| | (m)      all assets of Seller set forth on Schedule 2.2(m). |
| **Assumed Liabilities**<br><br>**Stalking Horse APA § 2.3** | (a)      the obligations of Seller, up to an aggregate amount of $600,000:<br>    (i)      under the Assumed Contracts and Assumed Leases to the extent required by section 365(b) of the Bankruptcy Code (in the amounts set forth on <u>Schedule 2.3(a)(i)</u> or as otherwise determined by the Bankruptcy Court) (the "<u>Cure Costs</u>"); and<br>    (ii)      owed to the suppliers set forth on <u>Schedule 2.3(a)(ii)</u> (in the amounts set forth on <u>Schedule 2.3(a)(ii)</u> or as otherwise determined by the Bankruptcy Court) (the "<u>Supplier Obligations</u>");<br>(b)      all Liabilities under the Assumed Contracts and the Assumed Leases arising at or after the Closing Date; and<br>(c)      all Liabilities arising out of the conduct of the Business or ownership of any Purchased Asset at or after the Closing Date.<br><br>Notwithstanding anything in the Stalking Horse APA to the contrary, by written notice to Seller delivered not later than two (2) days prior to the Closing, Purchaser in its sole discretion may remove any Assumed Contract set forth on Schedule 2.1(f), in which event any such removed Contract shall be deemed to be an Excluded Contract and an Excluded Asset and any Cure Cost or Liability associated therewith shall be deemed to be an Excluded Liability. |
| **Excluded Liabilities**<br><br>**Stalking Horse APA § 2.4** | (a)      any Liability of Seller, arising out of, or relating to, the Stalking Horse APA or the transactions contemplated by the Stalking Horse APA, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Seller;<br>(b)      other than as specifically set forth herein, any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);<br>(c)      any Liability for Taxes (i) attributable to periods or portions thereof as determined pursuant to <u>Section 7.6(a)</u> ending on or prior to the Closing Date, (ii) of Seller, or any member of any consolidated, affiliated, combined or unitary group of which Seller is or has been a member, for Taxes and (iii) of any other Person pursuant to an agreement or otherwise;<br>(d)      any Liability incurred by Seller or its directors, officers, |

| | |
|---|---|
| | stockholders, agents or employees (acting in such capacities) after the Closing Date; |
| | (e)      any Liability of Seller to any Person on account of any Action or Proceeding; |
| | (f)      any Liability relating to or arising out of the ownership or operation of an Excluded Asset; |
| | (g)      other than as specifically set forth herein, any Liability or obligation of Seller under any Indebtedness, including any Indebtedness owed to any stockholder, subsidiary or other Affiliate of Seller, and any Contract evidencing any such Indebtedness; |
| | (h)      any Liability with respect to Seller's employees (in their capacities as such), including, but not limited to, any Liability for severance or other termination payments or outstanding payroll taxes (which shall be paid by Seller during the Bankruptcy Case or immediately after the Closing Date from the proceeds of the transactions contemplated by this Agreement); |
| | (i)      other than as specifically set forth herein, fees or expenses of Seller incurred with respect to the transactions contemplated herein; and |
| | (j)      All Cure Costs and Supplier Obligations in excess of an aggregate amount of $600,000. |
| **Closing**<br><br>**Stalking Horse APA §§ 4.1, 8.1, 8.2, 8.3** | **4.1      Closing Date.**<br><br>Upon the terms and conditions set forth in the Stalking Horse APA the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated thereby (the "<u>Closing</u>") shall take place at the offices of Cullen and Dykman LLP, One Riverfront Plaza, Newark, New Jersey 07102, or by electronic delivery of required Closing items, as promptly as practicable, and at no time later than the third Business Day, following the date on which the conditions set forth in <u>Section 8</u> have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Purchaser and Seller may mutually agree.<br><br>**8.1      Conditions to Obligations of Each Party.**<br><br>The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by the Stalking Horse APA shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the following conditions:<br>(a)      all requisite authorizations or consents from Governmental |

Authorities or waiting periods following governmental filings shall have been obtained or expired, as the case may be;

(b)     the Sale Order shall have been entered and shall have become a Final Order; and

(c)     no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by the Stalking Horse APA that has not been withdrawn or terminated.

**8.2     Conditions to Obligations of Purchaser.**

(a)     The obligation of Purchaser to purchase of the Purchased Assets and to consummate the other transactions contemplated by the Stalking Horse APA shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)     the representations and warranties of Seller contained in the Stalking Horse APA, the Ancillary Documents and all other documents, instruments and certificates required to be delivered to Purchaser at or in connection with the Closing shall be true and correct in all respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have or would not reasonably be expected to have, a Material Adverse Effect, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof;

(ii)     each covenant and obligation that Seller is required to perform or to comply with pursuant to the Stalking Horse APA at or prior to the Closing shall have been duly performed and complied with in all material respects, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized manager or member thereof;

(iii)     each of the deliveries required to be made to Purchaser pursuant to Section 4.3 shall have been so delivered; and

(iv)     Purchaser shall have entered into employment agreements, on terms and conditions that are acceptable to Purchaser in its sole discretion, with (x) Seller's Chief Executive Officer, Robert McMurtry, consistent with the Employment Agreement Letter of Intent between Purchaser and Seller dated as of September 15, 2017, and (y) any other key management personnel identified by Purchaser prior to the Closing Date.

-10-

<table>
<tr><td></td><td>

(b)    Any condition specified in <u>Section 8.2(a)</u> may be waived by Purchaser; provided that no such waiver shall be effective against Purchaser unless it is set forth in a writing executed by Purchaser.

**8.3    Conditions to Obligations of Seller.**

(a)    The obligation of Seller to sell the Purchased Assets and to consummate the other transactions contemplated by the Stalking Horse APA shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)    the representations and warranties of Purchaser contained in the Stalking Horse APA shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except that any representations and warranties that are made as of a particular date or period shall be true and correct only as of such particular date or period), and Seller shall have received a certificate of Purchaser to such effect signed by a duly authorized officer thereof;

(ii)    each covenant and obligation that Purchaser is required to perform or to comply with pursuant to the Stalking Horse APA at or prior to the Closing shall have been duly performed and complied with in all material respects, and Seller shall have received a certificate of Purchaser to such effect signed by a duly authorized manager or member thereof; and

(iii)    each of the deliveries required to be made to Seller pursuant to <u>Section 4.2</u> shall have been so delivered; and

(b)    Any condition specified in <u>Section 8.3(a)</u> may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in writing executed by Seller.
</td></tr>
<tr><td>

**<u>Termination</u>**

**Stalking Horse APA § 9.1**
</td><td>

The Stalking Horse APA may be terminated, and the transactions contemplated thereby may be abandoned, by written notice to the other Parties hereto, at any time prior to the Closing Date, as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    by either Purchaser or Seller if any permanent injunction or other Order of a court of competent authority or government agency which prevents the consummation of the transactions contemplated by the Stalking Horse APA shall have become final and not appealable;

(c)    by either Purchaser or Seller upon three (3) days written notice of such termination to the other Parties, if the Closing shall not have occurred on or prior to December 22, 2017; provided, however, that the failure of the Closing to occur by such date is not due (in whole or in part) to a material breach by the
</td></tr>
</table>

-11-

| | |
|---|---|
| | terminating Party of such Party's representations, warranties, covenants or obligations under the Stalking Horse APA; |
| | (d)      by Seller if there has been a breach by Purchaser of any of its representations, warranties, covenants or obligations that would result in a condition set forth in <u>Section 8.3(a)(i)</u>, <u>(a)(ii)</u>, or <u>(a)(iii)</u> not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Seller to Purchaser, and has not been waived by Seller; |
| | (e)      by Purchaser if there has been a breach by Seller of any of its representations, warranties, covenants or obligations that would result in the condition set forth in <u>Section 8.2(a)(i)</u>, <u>(a)(ii)</u> or <u>(a)(iii)</u> not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Purchaser to Seller, and has not been waived by Purchaser; |
| | (f)      by either Purchaser or Seller if the Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated; |
| | (g)      by Purchaser if the Bankruptcy Court fails to approve the Sale Motion and enter (i) the Bidding Procedures Order on or prior to November 8, 2017 and (ii) the Sale Order on or prior to December 7, 2017; or |
| | (h)      by Purchaser if the Sale Order does not become a final Order on or prior to December 21, 2017. |
| **<u>Bid Protections</u>**<br><br>**Stalking Horse APA § 9.2** | As compensation for entering into the Stalking Horse APA, taking action to consummate the transactions contemplated thereby and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, Seller agrees to pay to Purchaser, in accordance with the provisions of <u>Section 9.2</u>, (i) a break-up fee in the amount of One Hundred Fifty-Thousand Thousand Dollars ($150,000.00) (the "<u>Break-up Fee</u>"), and (ii) reimbursement of its documented expenses incurred in connection with the Stalking Horse APA and the transactions contemplated thereby, including without limitation its out-of-pocket expenses incurred in connection with its due diligence investigation of Seller and the Business, and its reasonable attorneys' fees and expenses incurred in connection with the Stalking Horse APA and the transactions contemplated thereby, in an amount not to exceed One Hundred Fifty Thousand Dollars ($150,000) (the "<u>Expense Reimbursement</u>"). |
| **<u>Access to Records</u>**<br><br>**Stalking Horse APA § 7.10** | In order to facilitate Seller's efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "<u>Post-Close Filings</u>"), for a period of two (2) years following the Closing, Purchaser shall permit Seller and Seller's counsel and accountants (collectively, "<u>Permitted Access Parties</u>") during |

-12-

| | |
|---|---|
| | regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other books and records which comprised part of the Purchased Assets that are required to complete the Post-Close Filings, which access shall include (x) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (y) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copies and applicable Permitted Access Party reimburses Purchaser for the costs and expenses thereof; <u>provided</u>, <u>however</u>, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of Purchaser's business. Notwithstanding anything contained in <u>Section 7.6</u> to the contrary, in no event shall Seller have access to any information that, based on advice of Purchaser's external counsel, could (1) reasonably be expected to create liability under applicable law or waive any legal privilege, or (2) violate any obligation of Purchaser with respect to confidentiality; <u>provided</u> that, in the case of clause (1), Purchaser uses commercially reasonable efforts to attempt to provide the information in a way that does not create such liability or waive legal privilege and, in the case of clause (2),  Purchaser uses commercially reasonable efforts to secure a waiver of any contractual prohibition. |
| **Good Faith Deposit**<br><br>**Stalking Horse APA § 3.5** | Purchaser has deposited into the attorney trust account of Cullen and Dykman LLP, counsel to Seller, an amount equal to $200,000 (the "<u>Good Faith Deposit</u>") in immediately available, good funds of the United States of America.   Upon execution of this Agreement by Seller and Purchaser, the Good Faith Deposit shall be nonrefundable solely upon termination of this Agreement by Seller pursuant to <u>Section 9.1(d)</u>, and shall be refunded to Purchaser within two (2) Business Days after termination of this Agreement for any other reason provided for in <u>Section 9.1</u>.   At the Closing, the Good Faith Deposit (and any interest or income accrued thereon) shall be paid over to Seller and upon such payment, credited and applied toward payment of the Purchase Price and the amount of any such interest or income accrued on the Good Faith Deposit as of the Business Day prior to the Closing Date shall be credited dollar for dollar against the Cash Balance. In the event the Good Faith Deposit becomes nonrefundable as provided herein before the Closing, the Good Faith Deposit and all interest or income accrued thereon shall be immediately disbursed to Seller to be retained by Seller for its own account. |

35011.1 489692v5

| | |
|---|---|
| **Employee Matters**<br><br>**Stalking Horse APA § 7.5(a)** | Purchaser shall employ, effective as of the Closing Date and continuing for not less than sixty (60) days following the Closing Date, substantially all of Seller's employees who remain employed by Seller immediately prior to the Closing (including employees on approved leave of absence).  The names of Seller's employees as of the date hereof are listed on <u>Schedule 7.5(a)</u>.  Those of Seller's employees (including any employees whose names are not set forth on <u>Schedule 7.5(a)</u>) who commence working for Purchaser on the Closing Date (or upon return to work from approved leave of absence) shall hereafter be referred to as "Transferred Employees".  Such Transferred Employees shall receive the annual or hourly rate of pay, and with comparable opportunity to receive incentive or performance pay (other than equity based incentive compensation), at which such employees were employed immediately prior to the Closing.  Such Transferred Employees shall receive benefits and be covered by employment policies on substantially similar terms and conditions as other employees of Purchaser or its Subsidiaries with similar titles and functions.  Without limiting the generality of the foregoing, such employee benefits shall include immediate eligibility to participate in medical and health insurance plans and 401(k) or retirement plans under plans sponsored by Purchaser. |

**B.**     **Proposed Bidding Procedures**

9.     The key terms of the Bidding Procedures are highlighted as follows:[3]

(a)     <u>Due Diligence</u>:  In order to access diligence materials and information related to the Debtor's assets, each Potential Bidder must first deliver (unless previously delivered) to the Debtor's investment banker and counsel the following items prior to the Bid Deadline (collectively, the "<u>Participation Requirements</u>"): (i) an executed confidentiality agreement in form and substance reasonably acceptable to the Debtor; and (ii) identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Sale.

(b)     <u>Designation as Qualified Bidder</u>:  In order to be eligible to participate in the Auction for the Purchased Assets, each Potential Bidder, other than the Stalking Horse Bidder or its designee or assignee, must be determined by the Debtor, in consultation with the Committee, if any, to have submitted a Qualified Bid (each, a "<u>Qualified Bidder</u>").  The Debtor shall have the

---

[3]     To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.

35011.1 489692v5

right, in consultation with the Committee, if any, to determine whether a bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse Bidder's bid is a Qualified Bid.

In order for any Potential Bidder to be considered a Qualified Bidder (other than the Stalking Horse Bidder and its designee or assignee, who are already considered Qualified Bidders), such Potential Bidder must submit a written offer (a "Qualified Bid") such that it is received prior to the Bid Deadline and meets the following criteria:

(i)     Purchased Assets.  Each bid must be a bulk bid to purchase all or substantially all of the Purchased Assets, and must clearly state which liabilities of the Debtor the Qualified Bidder is agreeing to assume.

(ii)    Initial Minimum Overbid.   Each bid must provide for the assumption of the Assumed Liabilities and the aggregate consideration proposed by each bid must equal or exceed the sum of (collectively, the "Initial Minimum Overbid"):

(1)     cash in an amount equal to $4,000,000.00; plus

(2)     assumption of the Cure Costs and Supplier Obligations up to an aggregate amount of $600,000; plus

(3)     cash equal to the sum of the Break-Up Fee plus the Expense Reimbursement (i.e., $300,000.00), subject to confirmation of the amount of the Expense Reimbursement by the Debtor, after consultation with the Stalking Horse Bidder and the Committee, if any, prior to (and to be announced at) the Auction; plus

(4)     $100,000.00 in cash.

(iii)   Deposit.  Each bid must be accompanied by a cash deposit in the amount equal to Two Hundred Thousand and 00/100 Dollars ($200,000.00) to be held in an interest-bearing escrow account to be identified and established by the Debtor.

(iv)    Executed and Marked Asset Purchase Agreement.  Each bid must include a redlined copy of the Stalking Horse APA (the "Modified

<u>APA</u>") to show all changes requested by the Qualified Bidder, including those related to the purchase price in accordance with subsection (b) above, and identify each Contract and Lease to be assumed thereunder.

(v)     <u>No Contingencies</u>.  A bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence, and a bid shall not contain any contingencies to the validity, effectiveness, and/or binding nature of the bid beyond those contained and that remain effective in the Stalking Horse APA.

(vi)    <u>Legal Capacity</u>.  Each bid must be accompanied by documentation that, in the Debtor's reasonable business judgment, in consultation with the Committee, if any, demonstrates that the Potential Bidder has the legal capacity to fund a purchase price in the amount of the Initial Minimum Overbid as set forth above, and otherwise consummate the proposed transaction.

(vii)   <u>Authorization to Bid</u>.  Each bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA.

(viii)  <u>Irrevocability; Back-Up Bidder</u>.  Each bid must be irrevocable (in the form resulting from any modifications that may be made prior to or at the Auction) until the end of the Business Day following the Closing, and contain an agreement for the Qualified Bidder to be a Back-Up Bidder.

(ix)    <u>No Fees Payable to Qualified Bidder</u>.  A bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(x)     <u>Financing Sources</u>.  Each bid must contain evidence of the ability to consummate the Sale satisfactory to the Debtor, in consultation with the Committee, if any, with appropriate contact information for all such financing sources (whether cash or borrowings) and may not contain any financing contingency (or conditions to borrowings).

(xi)    <u>Other Evidence</u>. Each bid must contain evidence satisfactory to the Debtor, in its reasonable discretion, in consultation with the Committee, if any, that the Qualified Bidder (based on availability of financing, experience and other considerations or conditions)

-16-

will be able to timely consummate the Sale to purchase the Purchased Assets if selected as the Successful Bidder.

(c)     <u>Bid Deadline</u>. The Debtor proposes that the deadline for a Potential Bidder to submit a bid (other than the Stalking Horse Bidder or its designee or assignee) shall be December 1, 2017 at 12:00 p.m. (prevailing Central Time) (the "<u>Bid Deadline</u>"). A bid received after the Bid Deadline shall not constitute a Qualified Bid.

Prior to the Bid Deadline, a Potential Bidder shall deliver a written copy of its bid via email (in .pdf or similar format) to: (i) Three Twenty-One Capital Partners, Attn: Ervin M. Terwilliger, (erv@321capital.com) and (ii) Debtor's counsel, Cullen and Dykman LLP, Attn: S. Jason Teele, Esq. (steele@cullenanddykman.com) and Nicole Stefanelli, Esq. (nstefanelli@cullenanddykman.com). Counsel to the Debtor shall promptly provide email copies of such bids to counsel to the Committee, if any.

(d)     <u>Auction</u>. Only in the event that the Debtor receives at least one (1) Qualified Bid (other than that of the Stalking Horse Bidder) by the Bid Deadline, the Debtor shall conduct an auction (the "<u>Auction</u>") of the Purchased Assets to determine the highest or otherwise best bid with respect to the Purchased Assets. No later than 4:00 p.m. (prevailing Central Time) on the day that is one business day before the Auction, the Debtor will notify all Qualified Bidders and respective counsel to the Committee, if any, and the Stalking Horse Bidder whether the Auction will occur and will provide each Qualified Bidder with copies of all Qualified Bids.

The Debtor proposes that the Auction will take place at 10:00 a.m. (prevailing Central Time) on December 5, 2017, at the offices of Polsinelli PC, 150 N. Riverside Plaza, Suite 3000, Chicago, Illinois 60606, or such later date and time as selected by the Debtor.

(e)     <u>Participation in the Auction</u>. The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder, including the Stalking Horse Bidder (collectively, the "<u>Auction Participants</u>"). Each Qualified Bidder must attend the Auction in person in order to bid at the Auction. While only the Auction Participants may bid at the Auction, the Auction may be attended and viewed also by the Debtor, its professionals, Auction Participants, the Committee, if any, and its members and professionals. Any creditor wishing to attend the Auction, no later than three (3) business days prior to the start of the Auction, must contact: Cullen and Dykman LLP, Attn: S. Jason Teele, Esq. (steele@cullenanddykman.com) and Nicole Stefanelli, Esq. (nstefanelli@cullenanddykman.com).

(f)     Baseline Bid.  The Debtor and its professional advisors shall direct and preside over the Auction.  At the beginning of the Auction, the Debtor and its professional advisors will, in consultation with the Committee, if any, announce the highest Qualified Bid received by the Bid Deadline which shall serve as the baseline bid at the Auction (the "Baseline Bid").  All bids made thereafter shall be Overbids, and shall be made and received on an open basis, and all material terms of each bid shall be fully disclosed to all other Qualified Bidders, including the Stalking Horse Bidder.  The Auction shall be transcribed and all bids shall be made on the record and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(g)     Terms of Overbids.  An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid.  Any Overbid following the Baseline Bid shall be at least $25,000.00, and each subsequent Overbid must be made in increments of at least $25,000.00 over the previous highest or best bid (the "Minimum Overbid Increments"), which amount may be modified by the Debtor in its sole discretion; provided, however, that the Stalking Horse Bidder shall be permitted to bid all or any portion of the Break-up Fee or Expense Reimbursement as part of any overbid it submits at the Auction.

Any Overbid made by a Qualified Bidder (including with respect to any Back-Up Bid) must remain open and binding on the Qualified Bidder until and unless the Debtor accepts a higher Qualified Bid as an Overbid.  The Debtor shall announce at the Auction the material terms of each Overbid and the basis for calculating the total consideration offered in each such Overbid.

(h)     Determination and Rejection of Bids.  The Debtor, in its reasonable business judgment, after consultation with the Committee, if any, may (a) determine which Overbid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving an Overbid, any bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the Bidding Procedures Order or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtor, its estate, its creditors and other stakeholders.

(i)     Closing the Auction.  Upon conclusion of the bidding process, the Auction shall be closed, and the Debtor, in consultation with the Committee, if any, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale and the amount of the cash (or cash equivalents) consideration, and (ii) determine the highest or otherwise best offer for the Purchased Assets (the

-18-

"Successful Bid"), the entity submitting such Successful Bid (the "Successful Bidder"), the next highest or otherwise best offer after the Successful Bid (the "Back-Up Bid") and the entity submitting such Back-Up Bid (the "Back-Up Bidder"); and advise the Qualified Bidders of such determinations.  The Back-Up Bid shall remain open, and the Back-Up Bidder shall be required to fully perform under such Back-Up Bid, until the earlier of consummation of the Sale with the Successful Bidder or sixty (60) days following the closing date contemplated in the Successful Bid.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to serve as the Back-Up Bidder.

(j)    No Collusion; Good-Faith *Bona Fide* Offer.  Each Qualified Bidder, including the Stalking Horse Bidder, participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(k)    Consent to Jurisdiction as Condition to Bidding.  Each Qualified Bidder, including the Stalking Horse Bidder, participating at the Auction shall be deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes among any Qualified Bidder and the Debtor relating to the Auction and the construction and enforcement of the Qualified Bidder's contemplated Sale documents, as applicable.

(l)    Modification.  The Debtor reserves its rights to modify the Bidding Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all bids or Qualified Bids (except for the Stalking Horse Bidder's bid); and (f) adjusting the amount of the Minimum Overbid Increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis.

Notwithstanding the foregoing and subject in all respects to the Stalking Horse APA, the Debtor may not alter, impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse APA and the Bidding Procedures Order as part of any bid at the Auction or otherwise.

35011.1 489692v5

C.    **Notice of Auction and Sale Hearing**

10.    The Debtor proposes to have the Auction at 10:00 a.m. (prevailing Central Time) on December 5, 2017, at the offices of Polsinelli PC, 150 N. Riverside Plaza, Suite 3000, Chicago, Illinois 60606, or such later date and time as selected by the Debtor.  Within two (2) days of the entry of the Bidding Procedures Order, the Debtor will serve by first class mail, postage prepaid, copies of: (i) the Bidding Procedures Order and (ii) the Sale Notice upon the following entities: (a) the Office of the United States Trustee for the Northern District of Illinois; (b) counsel to the Stalking Horse Bidder; (c) the Debtor's prepetition secured lenders or their counsel, if known; (d) counsel to the Committee, if any; (e) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the Sale, including the Internal Revenue Service; (f) the state/local environmental agencies in the jurisdictions where the Debtor leases real property; (g) all of the Debtor's known creditors; (h) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures Order; (i) all persons or entities known to the Debtor that have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; and (j) any Potential Bidders previously identified or otherwise known to the Debtor.

11.    The Debtor proposes to have the Sale Hearing on December 6, 2017.  The Debtor further requests, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court, United States Courthouse, 2l9 South Dearborn Street, Chicago, Illinois 60604; and (d) be served on: (i) counsel to the Debtor, Cullen and Dykman LLP, Attn: S. Jason Teele, Esq. and Nicole Stefanelli, Esq., The Legal Center, One Riverfront Plaza, Newark, New Jersey 07102; (ii) counsel to the Stalking Horse Bidder, Meltzer, Purtill & Stelle LLC, Attn:

-20-

Timothy W. Brink, Esq., 300 South Wacker Drive, Suite 2300, Chicago, Illinois 60606; (iii)

counsel to the Committee, if any; and (iv) the Office of the United States Trustee for the

Northern District of Illinois, 219 S. Dearborn Street, Room 873, Chicago, IL 60604, on or before

4:00 p.m. (prevailing Central Time) on the date that is seven (7) days prior to the Sale Hearing

(the "Sale Objection Deadline").

**D.      Procedures to Determine Cure Costs and Deadlines for Objections to the Potential
Assumption and Assignment of the Assumed Contracts and Assumed Leases**

12.      In order to facilitate the assumption and assignment of the Assumed Contracts and

Assumed Leases, the Debtor seeks to establish (a) procedures for determining the Cure Costs and

(b) the deadline for objections to the Cure Costs and/or the proposed assumption and assignment

of the Assumed Contracts and Assumed Leases (collectively, the "Contract Procedures"):

(a)      On or before the date that is fifteen (15) days prior to the Sale Hearing, the
Debtor shall serve by mail a notice, substantially in the form annexed as
Exhibit 3 to the Bidding Procedures Order (a "Cure Notice") on the non-
Debtor counterparties to the Assumed Contracts and Assumed Leases
(collectively, the "Contract Parties").

(b)      The Contract Parties will have until 4:00 p.m. (prevailing Central Time)
on the date that is seven (7) days prior to the Sale Hearing (the "Contract
Objection Deadline"), which deadline may be extended in the sole
discretion of the Debtor and the Stalking Horse Bidder, to object (a
"Contract Objection") to (i) the Cure Costs listed by the Debtor and to
propose alternative Cure Costs, and/or (ii) the proposed assumption and
assignment of the Assumed Contracts and Assumed Leases in connection
with the Sale, including, without limitation, the Debtor's ability to assign
the Assumed Contracts and Assumed Leases without the Contract Parties'
consent or the adequate assurance of future performance to be provided by
the Successful Bidder (or any designee thereof); provided, however, that
in the event the Auction results in a Successful Bid other than the Stalking
Horse APA, the Contract Parties shall have until two (2) hours before the
Sale Hearing (the "Alternate Contract Objection Deadline") to object to
the assignment of the Assumed Contracts and Assumed Leases to such
Successful Bidder, other than to the Cure Cost which shall be subject to
the Contract Objection Deadline, with any such objection being heard at
the Sale Hearing or at a later-scheduled hearing as the Court deems
appropriate.

(c)     The Debtor, the Contract Party, and the Successful Bidder may consensually resolve any Contract Objection prior to, or after, the Sale Hearing.  In the event the Contract Objection is not resolved, such Contract Objection will be heard at the Sale Hearing or thereafter.  To the extent it is determined that the Cure Cost exceeds the amount set forth in the Cure Notice, the Successful Bidder may determine to not have such Assumed Contract or Assumed Lease assumed and assigned to it.

(d)     Unless a Contract Objection is filed and served before the Contract Objection Deadline or the Alternate Contract Objection Deadline, as applicable, all Contract Parties shall be:

    (i)     forever barred from objecting to the proposed Cure Costs and from asserting any additional cure or other amounts, and the Debtor and the Successful Bidder shall be entitled to rely solely upon the proposed Cure Costs set forth in the Cure Notice;

    (ii)     deemed to have consented to the assumption or assumption and assignment of the Assumed Contracts and Assumed Leases;

    (iii)     forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contracts and Assumed Leases, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Assumed Contracts and Assumed Leases, including without limitation, adequate assurance of future performance;

    (iv)     precluded from objecting to the Cure Costs (if any) and the assumption and assignment; and

    (v)     barred and estopped from asserting or claiming that an Assumed Contract or Assumed Lease contains an enforceable consent right.

13.    The Debtor requests that the Sale Order, among other things:

(a)     authorize and approve the assumption and assignment of the Assumed Contracts and Assumed Leases upon the Closing, without the need for any further action by any party, pursuant to section 365 of the Bankruptcy Code;

(b)     provide that where the Debtor is unable to establish that a default exists under an Assumed Contract or Assumed Lease, the Cure Cost relating to such Assumed Contract or Assumed Lease shall be set at $0.00; and

(c)   find that the Successful Bidder has established adequate assurance of future performance necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to the Successful Bidder of the Assumed Contracts and Assumed Leases.

## E.   <u>Name Change</u>

14.   The Debtor also requests the authority, upon and in connection with the Closing, to change its corporate name and the caption of this chapter 11 case, consistent with applicable law.  The Debtor shall file a notice of change of case caption, containing the new caption and the proposed new corporate name of the Debtor, within five (5) business days of the Closing Date, and the change of case caption for this chapter 11 case shall be deemed effective as of the Closing Date.

## <u>BASIS FOR RELIEF</u>

## A.   <u>The Bidding Procedures Are Fair and Reasonable.</u>

15.   Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  *See, e.g., Four B Corp. v. Food Barn Stores (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, a primary objective of the Code [is] to enhance the value of the estate at hand); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

16.   Courts consistently recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., In re Integrated Res.*, 147 B.R. at 659 (such procedures encourage bidding and to maximize the value of the debtor's

-23-

assets); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Bankruptcy courts have discretion and latitude in structuring a section 363 sale to accomplish this goal. *See Edwards*, 228 B.R. at 561; *In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring the sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

17.     Here, the Debtor believes that the Bidding Procedures are designed to maximize the value received for the Purchased Assets and prevent any chilling of potential bids by establishing a competitive and fair bidding process. In particular, the process set forth in the Bidding Procedures allows for a timely and efficient auction process given the circumstances facing the Debtor, while providing Potential Bidders with ample time and information to submit a timely bid and perform diligence. The Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price by subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets. Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable and that the proposed Bidding Procedures will not chill bidding by any Potential Bidders. Moreover, the proposed Bidding Procedures are fair and appropriate in light of the robust prepetition marketing process undertaken by the Debtor.

-24-

18.     For these reasons, the Debtor respectfully submits that the Bidding Procedures should be approved.

**B.     The Bid Protections Are Appropriate Under the Circumstances.**

19.     In the event that the Bankruptcy Court approves a transaction with a Qualified Bidder that is not the Stalking Horse Bidder, then the Debtor will pay to the Stalking Horse Bidder as compensation for the Stalking Horse Bidder's efforts in connection with the negotiation and execution of the Stalking Horse APA, and the transactions contemplated thereby, not later than the time of the closing of such transaction, in immediately available, good funds of the United States of America, (i) the Break-Up Fee in the amount of One Hundred Fifty Thousand Dollars ($150,000.00), and (ii) the Expense Reimbursement for reimbursement of its documented expenses incurred in connection with the Stalking Horse APA and the transactions contemplated thereby, including without limitation its out-of-pocket expenses incurred in connection with its due diligence investigation of the Debtor and the Business, and its reasonable attorneys' fees and expenses incurred in connection with the Stalking Horse APA and the transactions contemplated thereby, in an amount not to exceed One Hundred Fifty Thousand Dollars ($150,000), in accordance with the provisions of Section 9.2 of the Stalking Horse APA.

20.     Negotiation of the Break-Up Fee and Expense Reimbursement was a key component of the Stalking Horse Bidder's willingness to serve in that role.  The Debtor believes that the Expense Reimbursement is fair and reasonable in view of the time and expense that the Stalking Horse Bidder has undertaken in connection with the Stalking Horse APA.  Although bid protections in favor of a stalking horse bidder are measured against a business judgment standard, to receive administrative expense priority pursuant to Bankruptcy Code section 503(b), the bidding incentive must provide some post-petition benefit to the estate.  *See In re O Brien*

-25-

*Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999).  The *O'Brien* court identified two instances in which such a benefit to the estate may be found. The first instance is where the incentive promoted a more competitive bidding process, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited.  *Id.* at 537.  The second instance is where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.  *Id.*

21.     The amount of the Break-Up Fee and Expense Reimbursement as set forth in the Stalking Horse APA is reasonable and appropriate in light of the size and nature of the proposed transaction. Moreover, the Expense Reimbursement meets the *O'Brien* test set forth above, in that it induced the Stalking Horse Bidder to serve as the initial bidder, and the Stalking Horse APA will now serve as the floor bid on which other bidders can rely.

22.     In addition, the amount of the Break-Up Fee is reasonable, as it is equivalent to 3.2% of the proposed value of Stalking Horse Bidder's offer as set forth in the Stalking Horse APA.  This amount is within the range of break-up fees approved in similar cases.  *See, e.g., In re CWT Liquidation Co. (formerly doing business as The Clare at Water Tower)*, Case No. 11-46151 (Bankr. N.D. Ill. Mar. 21, 2012) [No. 264] (SPS) (approving break-up fee equal to 4.57% of cash purchase price); *In re Fairview Ministrie*s, Case No. 11-04386 (Bankr. N.D. Ill. May 24, 2011) [No. 277] (SPS) (approving break-up fee of 3% of purchase price); *In re SK Hand Tool Corp.*, Case No. 10-28882 (Bankr. N.D. Ill. July 9, 2010) [No. 53] (ERW) (approving break-up fee of 3.8% of purchase price); *In re Select Snacks, Inc.*, Case No. 07-18769 (Bankr. N.D. Ill. Oct. 23, 2007) [No. 93] (PSH) (approving break-up fee equal to 3% of purchase price); *In re Hartmarx Corp.*, Case No. 09-02046 (Bankr. N.D. Ill. June 2, 2009) [No. 482] (BWB) (approving break-up fee equal to 3.1% of purchase price).

23.     Moreover, payment of the Break-Up Fee and Expense Reimbursement will not diminish the value of assets available for distribution to creditors, because, as stated above, the Debtor will only be required to make the payments if the Bankruptcy Court approves a transaction with and the Debtor consummates a sale to an alternative bidder for a price that exceeds the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay both the Break-up Fee and the Expense Reimbursement.

24.     For these reasons, the Debtor respectfully submits that approval of the Break-Up Fee and Expense Reimbursement is appropriate under the circumstances.

**C.     The Proposed Sale Notice, the Proposed Date for the Sale Objection Deadline, the Cure Objection Deadline and the Sale Hearing Are Appropriate.**

25.     The Debtor submits that the Sale Objection Deadline is reasonable and appropriate under the circumstances.  As noted above, the Sale Hearing is more than twenty-one (21) days from notice of this Motion and the Sale Objection Deadline has been scheduled seven (7) days in advance thereof.  As such, the Debtor submits that the proposed Sale Objection Deadline meets the requirements of the Bankruptcy Rules.

26.     The Debtor further submits that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bidding Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadline; and (d) the Sale Hearing.  Therefore, the Debtor respectfully requests that the Bankruptcy Court to approve the proposed notice procedures.

**D.    The Sale of the Purchased Assets is Within the Sound Business Judgment of the Debtor and Should be Approved.**

27.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor.  See 3 COLLIER ON BANKRUPTCY ¶ 363.02[4] (16th ed. 2012); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (requiring "articulated business justification" for sale, adequate notice, and the availability of a hearing to approve sale under § 363(b)); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D.Del. 1999); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *In re U.S. Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002).

28.    A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *See Lionel*, 722 F.2d at I071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

29.     The Debtor submits that ample business justification exists to sell the Purchased Assets pursuant to the Bidding Procedures.  The sale of the Purchased Assets presents the best opportunity to maximize the value for the estate in light of the need to manage and transition the Purchased Assets to a purchaser.  Further, the Debtor submits that the sale of the Purchased Assets must occur quickly to maximize value in this chapter 11 case and that extended time spent in chapter 11 increases the risk of business loss and value deterioration.  Absent a reasonably prompt sale pursuant to the procedures and timelines proposed, the Debtor believes that the going-concern value of the Purchased Assets will be significantly compromised.  The Debtor further believes that a targeted sale process is most likely to achieve the highest and best price for the Purchased Assets and will do so in an efficient and timely manner, enabling the Purchased Assets to emerge successfully from this case.  The Debtor respectfully submits that the relief sought by this Motion is not only reasonable but necessary to maximize the value of its estate for the benefit of the Debtor and its stakeholders.

30.     The Debtor has articulated ample business justification for the Sale and, through the measures and safeguards proposed in the Bidding Procedures, has guaranteed adequate notice to all creditors and the availability of a hearing on the Sale.  Accordingly, the proposed Sale comports with the requirements of a § 363(b) sale as enunciated by the Seventh Circuit in *In re Schipper*. 933 F.2d at 515.

## E.     The Sale of the Purchased Assets is Proposed in Good Faith under Section 363(m) of the Bankruptcy Code.

31.     The Debtor requests that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

32.     Section 363(m) of the bankruptcy Code provides, in pertinent part:

-29-

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

33.    Section 363(m) protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) applies to sales of interests in tangible assets. However, some courts have applied the protections of 363(m) to assignments of executory contracts as well.  *See In re Kmart Corp.*, No. 03 C 698, 2003 WL L956I49, at *3 (Bankr. N.D. Ill. April 23, 2003).  As required by section 363(m), the Bidding Procedures have been proposed in good faith and provide for both the Debtor and any potential purchaser to act in good faith in negotiating the sale of the Purchased Assets and the assignment of the Contracts and Leases related thereto.  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders."  *In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 n.3 (Bankr. N.D. Ill. 1988) (quoting *In re RockIndus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1 195, 1998 (7th Cir. 1978)).

-30-

34.     As required by section 363(m), the Sale has been proposed in good faith.  As will be demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel.  All negotiations have been and will continue to be conducted on an arm's length, good faith basis.  Moreover, there is no evidence of fraud or collusion in connection with the proposed Sale.

35.     Accordingly, under the circumstances, the Successful Bidder should be afforded the protections that section 363(m) provides to a good faith purchaser.

**F.      The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

36.     Under section 363(f) of the Bankruptcy Code, a debtor may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or, interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  *See* 11 U.S.C. § 363(f); *see also In re Zeigler*, 320 B.R. at 387 (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f*).  See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at*3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

-31-

37.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale of the Purchased Assets free and clear of Encumbrances. *See, e.g., In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the [d]ebtors have the authority to conduct the [s]ale free and clear of all liens.").

38.     The Debtor submits that section 363(f) permits the Sale of the Purchased Assets free and clear of Encumbrances, except the Permitted Encumbrances because such Encumbrances will be adequately protected by attachment to the Sale Proceeds. Accordingly, the Purchased Assets should be transferred to the Successful Bidder free and clear of all Encumbrances, other than the Permitted Encumbrances, with such Encumbrances to attach to the Sale Proceeds.

## G.      Assumption and Assignment of Contracts and Leases Should be Approved

39.     To facilitate and effectuate the sale of the Purchased Assets, the Debtor seeks authority to assume, assign and/or transfer various Contracts and Leases to the Successful Bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court; provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and

-32-

rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *see also Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

40.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtor has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

41.    The Debtor believes that it can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Assumed Contracts and Assumed Leases will be satisfied at the Sale Hearing. The Debtor, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets. Further, for the reasons stated throughout this Motion, the Debtor, in exercising its sound business judgment, believes that selling the Purchased Assets and assuming, assigning and/or transferring to the Successful Bidder or Back-Up Bidder the Assumed Contracts and Assumed Leases would be in the best interests of its estate. Moreover, as discussed above, the Debtor will provide all parties to the Assumed Contracts and Assumed Leases with notice and an opportunity to be heard.

### H. **Waiver of Bankruptcy Rule 6004(h) and 6006(d) is Appropriate.**

42. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that "an order authorizing the trustee to assign an executory contract of unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

43. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, *Collier on Bankruptcy* suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 6004.11 (16th rev. ed. 2011). Furthermore, *Collier* suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

44. The Debtor requests that the Bankruptcy Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## WAIVER OF PAGE LIMIT RESTRICTION

45.     Given the complexity of issues addressed herein, the Debtor respectfully requests that the fifteen page limit established by Local Rule 5005-3(D) be waived for this Motion.

## NOTICE

46.     No trustee, examiner or official committee has been appointed in this chapter 11 case.  Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Northern District of Illinois; (b) counsel to the Stalking Horse Bidder; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors; (d) the Debtor's prepetition secured lenders or their counsel, if known; and (e) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(D).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## NO PRIOR REQUEST

47.      No prior application or motion for the relief requested herein has been made by the Debtor to this or any other Court.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

35011.1 489692v5

**WHEREFORE**, the Debtor respectfully requests entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, and the Sale Order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated:  October 27, 2017
       Chicago, Illinois

Respectfully submitted,

**CULLEN AND DYKMAN LLP**

*/s/ Michael H. Traison*
S. Jason Teele, Esq.
Nicole Stefanelli, Esq.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 849-0220
Facsimile: (973) 849-2020
steele@cullenanddykman.com
nstefanelli@cullenanddykman.com

-and-

Michael H. Traison, Esq.
175 East Delaware Place
Suite 7011
Chicago, Illinois 60611
Telephone: (312) 860-4230
mtraison@cullenanddykman.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

35011.1 489692v5