## Exhibit B

AGREEMENT BETWEEN TEC AIR, INC.
AND THREE TWENTY-ONE CAPITAL PARTNERS, LLC

THIS AGREEMENT is made this 4th day of November 2017 by and between TEC AIR, INC. ("CLIENT"), and **THREE TWENTY-ONE CAPITAL PARTNERS, LLC** ("321").

RECITALS

WHEREAS, CLIENT seeks to sell all assets of TEC AIR, INC. via §363 Sale in the United States Bankruptcy Court in the Northern District of Illinois (the BANKRUPTCY COURT), Chapter 11 Case No. 17-32273 (the CHAPTER 11 CASE), commenced on October 27th, 2017; and

WHEREAS, Client will likely require Debtor-In-Possession ("DIP") Financing to be used during the bankruptcy; and

WHEREAS, 321 is an enterprise specializing in bankruptcy proceedings, entirety sales, strategic mergers, equity investments, joint ventures, debt and equity recapitalizations, purchase of chattels and real property, sale of assets, restructuring engagements; and

WHEREAS, 321 is an enterprise associated whose members have extensive experience in advising over 500 companies; and

WHEREAS, 321 has substantial experience in restructuring processes, including Bankruptcy, Assignment for the Benefit of Creditors, Article 9 Foreclosures and Bulk Sales; and

WHEREAS, 321 has substantial experience in locating acquirors, investors, sources of debt capital, and joint venture partners for distressed or "storied" businesses; and

WHEREAS, CLIENT and 321 desires to enter into this AGREEMENT regarding INVESTMENT BANKING SERVICES to be performed by 321 and the compensation to be paid to 321 for its services; and

NOW THEREFORE, in consideration of the promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, CLIENT and 321 hereby agree, subject to all the terms, covenants, conditions and provisions hereinafter set forth, as follows:

1. **EXCLUSIVE AGENCY.** CLIENT hereby retains 321 as exclusive agent, to utilize 321's experience to secure one or more counterparties to purchase the assets of Tec-Air and / or provide DIP financing (the "TRANSACTION"). The term of 321's exclusive agency shall begin as of the date of this AGREEMENT. The term of 321's exclusive agency shall begin as of the date of this AGREEMENT and shall continue for three hundred and sixty-five days (365) days. This agreement shall automatically be extended in 30-day increments unless cancelled in writing prior to termination of exclusive period.  Either party may terminate this notice on not less than thirty (30) days prior notice, subject to the provisions of Paragraph 6

below.

2. **INVESTMENT BANKING SERVICES.**  321 shall perform the following services:

(a) Work with CLIENT to devise the best course of action to effectuate the desired outcome for the CLIENT.

(b) Conduct due diligence on CLIENT's business.

(c) Devise restructuring scenarios with CLIENT.

(d) Create a marketing plan.

(e) Create financial modeling to aid in the TRANSACTION.

(f) Work with third party professionals and creditors.

(g) Attend and advise for all required Court or Trustee matters.

(h) Prepare marketing materials, confidential information memorandum and secure due diligence data room which will include information regarding the business. (CLIENT shall have final approval of all materials and their use and prior approval of all prospective purchasers given access to the data room).

(i) Endeavor to locate parties who may have an interest in a TRANSACTION with the CLIENT.

(j) Circulate materials to all parties in interest regarding the business; provided, however, 321 shall not release materials or information concerning CLIENT's business or its assets to any party that has not been approved in writing in advance by CLIENT.

(k) Respond, provide information to, communicate and negotiate with and obtain offers from interested parties and make recommendations to CLIENT as to whether an offer should be accepted.

(l) Communicate regularly, including a weekly report, with CLIENT about the status of 321's efforts with respect to the marketing efforts.

(m) Recommend to CLIENT the proper method of handling any specific problems encountered with respect to the marketing of the business.

(n) Perform related services necessary to maximize the proceeds to be realized for the business.

(o)  321 shall have no authority to bind CLIENT to any agreements or offers.

321's services shall commence upon execution of the AGREEMENT.

3. **OFFERING PROCEDURE.**  CLIENT shall offer information regarding CLIENT's business and its assets under a procedure that shall include the following:

(a)  All communications and inquiries regarding a potential TRANSACTION shall be directed to 321.

(b)  To be considered, all offers must be accompanied by appropriate financial material showing ability to close a transaction and include a deposit where deemed necessary.

(c)  CLIENT shall have the right to:

(i)  Determine in its sole discretion which offer, if any, is to be accepted; and

(ii) Reject, at any time, any offer which, in the CLIENT's sole discretion, is deemed to be inadequate or insufficient or not in conformity with the terms and conditions of this AGREEMENT

(d)  CLIENT, upon notice to those parties which have submitted offers, may impose other terms and conditions as it may determine to be in the best interest of the CLIENT.

4. **EXPENSES.**  Out-of-pocket expenses are the responsibility of the CLIENT subject to a budgeted amount of Fifteen Thousand Dollars ($15,000). These monies are strictly for marketing costs, business services, database services, printing, mailing, and travel-related expenses. Expenses over the aggregate sum of $15,000 are the responsibility of 321. The sum of $5,000 is due to 321 upon execution of this AGREEMENT. 321 shall request the additional $5,000 of expenses when needed. The final installment of expenses shall be drawn from closing proceeds.  321 shall make every best effort to limit expenses.

5. **TRANSASCTION VALUE.**  The term TRANSACTION VALUE as used in this AGREEMENT shall include the gross sum of the following payments or assumptions by the purchaser, plus the amount of any interim DIP financing provided by the purchaser or another party during the Bankruptcy ("TRANSACTION VALUE"):

(a) The total gross value of all consideration (including credit bids, cash, securities or other property) paid or received or to be paid or received, directly or indirectly, in connection with a Transaction in respect of the assets of the Company or the outstanding securities of the Company on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested), plus the principal amount of any debt (including, but not limited to assumed leases and accounts payable) of the Company outstanding as of the closing date of a TRANSACTION or directly or indirectly of the Business that is assumed, refinanced or extinguished in connection with a TRANSACTION, and amounts payable in connection with earnouts, agreements not to compete, consulting agreements,

employment agreements or similar arrangements, restricted securities, options, or other future non-cash consideration.

(b) If the TRANSACTION takes the form of a recapitalization, equity investment, or similar transaction, TRANSACTION VALUE will also include the value of all shares retained by the shareholders of the acquired company or the value of equity interests rolled over or invested into a new corporate entity.

(c) The fees and expenses of 321, credit bids, and all other closing costs shall not be deducted when computing TRANSACTION VALUE or the fee to be paid to 321.

(d) TRANSACTION VALUE shall also include the gross commitment amount of the line of credit, term loan or other debt instrument used for the DIP financing regardless of the amount of actual funding.

6. **321 FEE.** 321 will be paid a fee at the closing of a TRANSACTION (the "FEE) based upon TRANSACTION VALUE received by CLIENT and computed using the following formula:

> EIGHT PERCENT (8%) FOR THE FIRST MILLION ($0-$1MM); plus
> SEVEN PERCENT (7%) FOR THE SECOND MILLION ($1,000,001-$2MM); plus
> SIX PERCENT (6%) FOR THE THIRD MILLION ($2,000,001-$3MM); plus
> FIVE PERCENT (5%) FOR THE FOURTH MILLION ($3,000,001-$4MM); plus
> FOUR PERCENT (4%) FOR THE FIFTH MILLION ($4,000,001-$5MM): and plus
> THREE PERCENT (3%) ALL TRANSACTION VALUE ABOVE FIVE MILLION ($5,000,001 and above)

The FEE shall be the greater of: (a) the result of the calculation above or (b) a minimum fee of $250,000.  The FEE shall be paid in cash at closing with respect to any portion of the TRANSACTION VALUE.

321 shall be entitled to receive its fee from any TRANSACTION made within Two Years (2) Years following the termination of this AGREEMENT by a prospect identified as a REGISTERED PROSPECT. A REGISTERED PROSPECT shall be considered a qualified lead contacted by 321 during the exclusive engagement period.

7.  **NOTICES.**  All notices, statements, demands, requests, consents, communications and certificates from any party hereto to the other, shall be made in writing and sent by United States registered mail or certified mail, return receipt requested, postage prepaid, addressed as follows:

(a) If intended for the CLIENT:          (b) If intended for the 321:

Robert McMurtry                          Ervin M. Terwilliger
Tec Air, Inc.                            Three Twenty-One Capital Partners,
9200 Calumet Ave.                        LLC.
Munster, IN 46321                        2205 Warwick Way Suite 310
                                         Marriottsville, MD 21104

With copy to Counsel:

S. Jason Teele
Nicole Stefanelli
Cullen & Dykman, LLP
One Riverfront Plaza
Newark, NJ 07102

or other such addresses or entities either party hereto may from time to time direct by service of notice on the other party as provided above.

8.  **9. DISCLAIMER AND WAIVER OF LIABILITY.**  CLIENT will verify all qualifications of any party it enters a TRANSACTION.  321 will not make any verifications or warranties, including, but not limited to, counterparties' health, experience, competency, residency or financial status.  321 shall not be liable or responsible for any claims and damages of any kind to CLIENT relating to the above referenced transactions, including, but not limited to, all claims and damages of every kind attributable to the performance or non-performance of CLIENT and /or a counterparty in any TRANSACTION.

10. **NON-ASSIGNABILITY.** Neither party hereto shall assign this AGREEMENT or any of its rights or interest hereunder without first obtaining the other party's written consent.

11. **TIME OF THE ESSENCE.**  Time, whenever mentioned herein shall be of the essence of this AGREEMENT.

12. **ENTIRE AGREEMENT.**  This is the entire AGREEMENT between the parties hereto regarding the transaction contemplated hereby and there are no other terms, covenants, conditions, provisions, warranties, representations or statements, oral or otherwise, of any

kind whatsoever.  Any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this AGREEMENT in whole or in part unless such agreement is in writing and signed by the party against whom the enforcement of the change, modifications, discharge or abandonment is sought.

13. **HEADINGS.** The headings, if any, incorporated in this AGREEMENT are for the convenience and reference only and are not part of this AGREEMENT and shall not in any way control, define, limit or add to the terms and conditions hereof.

14. **GOVERNING LAW.**  This AGREEMENT shall be construed, interpreted and governed by the laws of the State of Maryland.

15. **COUNTERPARTS.**  This AGREEMENT may be executed in any number of counterparts, each of which shall be original, but such counterparts together shall constitute one and the same instrument.

16. **LEGAL CONSTRUCTION.** In case any one or more of the provisions contained in this AGREEMENT shall for any reason be held to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality or enforceability shall not affect any other provision of this AGREEMENT and this AGREEMENT shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

IN WITNESS WHEREOF, the parties hereto have duly executed this AGREEMENT under seal, as of the day and year first above written.

*Subject to Bankruptcy Court Approval*

TEC AIR, INC.

By: _____

Robert McMurtry
President & CEO

THREE TWENTY-ONE CAPITAL
PARTNERS, LLC

By: _____

Ervin M. Terwilliger
Managing Partner