UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS (CHICAGO)
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| TEC-AIR, INC., | Case No. 17-32273 (JSB) |
| Debtor. | |

### INTERIM ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING THE USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION, (D) SCHEDULING A FINAL HEARING AND (E) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Tec-Air, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2 for entry of an interim order (this "Interim Order") and, after a further notice and a hearing, a final order (the "Final Order" and together with this Interim Order, the "Orders"), *inter alia*:

(i)        authorizing the Debtor to obtain post-petition financing and incur debt (the "DIP Loan"), in the aggregate principal amount of $6,063,793.53, pursuant to a post-petition credit agreement, substantially in the form attached hereto as Exhibit 1 (together with all other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of Leaders, each as may be amended, modified, or supplemented and in effect from time to time, the "DIP Loan Agreement"),[1] by and between the Debtor, as borrower, and The Leaders Bank ("Leaders");

(ii)        authorizing the Debtor to use Cash Collateral (as defined below);

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement, as applicable.

(iii)    granting adequate protection;

(iv)    scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and

(v)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and the Orders.

The Court having considered the Motion, and the evidence submitted by the Debtor at the hearing held on November 30, 2017 (the "Interim Hearing"); and notice of the Interim Hearing have been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor, its estate, and its creditors, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**THE DEBTOR HEREBY STIPULATES AND AGREES AS FOLLOWS**:

After consultation with its attorneys, and subject to and without prejudice to the rights of the parties in interest as set forth in paragraph 16 herein, the Debtor stipulates, acknowledges and agrees that (collectively, paragraphs (I) through (XI) below are referred to herein as the "Debtor's Stipulations"):

(I)    As of the Petition Date (defined below), the Debtor is indebted to Leaders Bank in the amount of $5,463,793.53 (the "Leaders Prepetition Claim") pursuant to that certain Amended, Restated, and Consolidated Term Note dated May 28, 2015 and that certain Term

-2-

Note dated April 26, 2016 (collectively, and together with all other agreements, documents, and instruments executed and/or delivered therewith, the "Leaders Notes") and that certain Forbearance Agreement dated April 26, 2016, as modified by that certain First Modification to Forbearance Agreement dated June 30, 2017;

(II)    To secure repayment of its obligations under the Leaders Notes, the Debtor granted Leaders a first-priority security interest in and liens on (collectively, the "Leaders Prepetition Liens") all of the Debtor's rights, title and interest in and to all of the following assets whether then existing or thereafter arising: all inventory, equipment, accounts (including but not limited to all health-care insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles), all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media, and all support obligations relating to the foregoing property, all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property, and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property (collectively, the "Leaders Prepetition Collateral");

(III)    The Debtor acknowledges and agrees that: (a) the Leaders Prepetition Liens constitute legal, valid, binding and non-avoidable obligations of the Debtor; and (b) the Leaders Prepetition Liens have first priority over any and all other liens, if any, on the Leaders

-3-

Prepetition Collateral, subject only to the PMSI (defined below) and any liens otherwise permitted by the Leaders Notes (to the extent any such permitted liens are valid, binding, enforceable, property perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date) and otherwise have priority over any and all other liens on the Leaders Prepetition Collateral;

(IV)   As of the Petition Date, the Debtor is indebted to Byline Bank, as successor by merger to Ridgestone Bank ("Byline" and together with Leaders, the "Prepetition Lenders") in the amount of $2,250,281.48 pursuant to that certain Loan Agreement, that certain U.S. Small Business Administration Note and that certain U.S. Small Business Administration Security Agreement, each dated as of June 29, 2015 (collectively, the "SBA Loan Agreement" and together with the Leaders Notes, the "Prepetition Loans");

(V)   The Debtor's obligations under the SBA Loan Agreement, are secured by a purchase money security interest in favor of Byline (the "PMSI") in the following equipment: Chicago Electronic Robotics (laundry), Chicago Electronic Robotics (Zoneline), Nigata Molding Machine (385), Nigata Molding Machine (385), Nigata Molding machine (310), Nigata Molding Machine (310), 3 form machine, Matsui Press Side Grinders (10), IQMS Warehouse Management System (WMS), IT Infrastructure/Security (collectively, the "PMSI Collateral" and together with the Leaders Prepetition Collateral, the "Prepetition Collateral");

(VI)   The Debtor waives the right to challenge (a) the validity, extent, priority, or perfection of the Leaders Prepetition Liens and (b) the validity, allowability, priority, secured status or amount of the Leaders Prepetition Claim.

(VII)   The Debtor will continue to operate its business in the ordinary course consistent with the terms of the Budget (defined below) and shall provide authorized

-4-

representatives of Leaders reasonable access to its books and records and other reporting functions;

(VIII)  <u>Adequate Protection as to Leaders</u>.

(a)      Leaders is entitled to and shall be granted replacement security interests and liens upon all assets of the Debtor, whether now existing or hereafter acquired and the proceeds and products thereof, excluding the PMSI Collateral.

(b)      Leaders is entitled to and shall receive a superpriority administrative expense claim pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

(c)      Leaders is entitled to and shall receive adequate protection payments in the form of (a) monthly payments of interest, reasonable fees and other amounts due under the DIP Loan and (b) ongoing payment of Leaders' reasonable fees, costs and expenses, including, without limitation, legal and other professional fees and expenses.

(d)      Subject to the entry of the Final Order, in light of Leader's agreement to subordinate superpriority administrative expense claim and replacement liens to the Carve-Out, and the Budget covering all administrative costs projected by the Debtor, Leaders is entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (c) the equitable doctrine of "marshaling" or any similar doctrine.

(IX)    <u>Adequate Protection as to Byline</u>.  Byline is entitled to and shall be granted replacement security interests and liens upon the PMSI Collateral solely to the extent of any diminution in the value of the PMSI Collateral from and after the Petition Date.

(X)     <u>Extension of Financing</u>.  Leaders has indicated a willingness to provide financing to the Debtor in accordance with the DIP Loan Agreement, subject to (i) the entry of

-5-

the Orders, and (ii) findings by the Court that such financing is essential to the Debtor's estate, that Leaders is a good faith financier, and that the liens and other protections granted to Leaders pursuant to the Orders and the DIP Loan will not be affected by any subsequent reversal or modification of this Interim Order unless the Interim Order was stayed pending appeal, as provided in section 364(e) of the Bankruptcy Code.

(XI)    Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Loan and the DIP Loan Agreement are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Loan was negotiated in good faith and at arms' length between the Debtor and Leaders. The proceeds to be extended under the DIP Loan will be so extended in good faith, and for valid business purposes and uses, as a consequence of which Leaders is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]**

A.    Petition Date. On October 27, 2017 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Northern District of Illinois (the "Court").

B.    Debtor-in-Possession. The Debtor continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

35011.1 495699v7

C.    Jurisdiction and Venue. The Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Statutory Committee.  On November 6, 2017, the Office of the United States

Trustee for the Northern District of Illinois (the "U.S. Trustee") appointed an official committee

of unsecured creditors (the "Committee") pursuant to section 1102(a) of the Bankruptcy Code.

E.    Notice. The Interim Hearing was held pursuant to Bankruptcy Rule 4001 and

Local Rule 4001-2.  Notice of the Interim Hearing and the relief requested in the Motion has

been provided by overnight mail on November 21, 2017 to: (a) the U.S. Trustee; (b) counsel to

the Committee; (c) counsel to the Prepetition Lenders; and (d) all parties that have filed a

request for notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Under

the circumstances, such notice of the Interim Hearing and the relief requested in the Motion is

sufficient and complies with sections 102(1) and 364(d) of the Bankruptcy Code, Bankruptcy

Rules 2002, 4001(b), 4001(c), 4001(d), and the Local Rules.

F.    Findings Regarding the Post-Petition Financing.

(i)    *Need for Post-Petition Financing and Use of Cash Collateral*.  The ability

of the Debtor to finance its operations requires immediate access to cash derived from operating

the businesses claimed as collateral by the Prepetition Lenders (as such term is defined in section

363(a) of the Bankruptcy Code, the "Cash Collateral"), the absence of which would immediately

and irreparably harm the Debtor, its estate, and its creditors.  The Cash Collateral constitutes

property of the Debtor's estate.  In addition to the use of Cash Collateral, the Debtor requires the

additional funds being provided through the DIP Loan in order to continue the operation of its

business and administer and preserve the value of the estate for the benefit of creditors.  If the

Debtor is not able to use Cash Collateral and the proceeds of the DIP Loan as provided herein it will be unable to fund payroll and other operating expenses that are necessary to maintain the value of the Debtor's estate and to enable the Debtor to maximize recoveries for all parties in interest.

(ii) *No Credit Available on More Favorable Terms.* Given its current financial condition and financing arrangements, and the length of the term of the DIP Loan, the Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code. The Debtor also has been unable to obtain secured credit from other sources: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured only by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien. Further, Leaders has not consented to the priming of the Leaders Prepetition Liens by any other lenders (except to the extent provided herein and under the DIP Loan Agreement). Financing on a post-petition basis is not otherwise available without granting to Leaders the protections, rights, and remedies set forth in the DIP Loan Agreement and this Interim Order.

(iii) *Use of Proceeds of the DIP Loan.* Proceeds of the DIP Loan shall be used in a manner consistent with the terms and conditions of the DIP Loan Agreement and in compliance with the Budget and limitations set forth in this Interim Order, solely for working capital and for restructuring costs and expenses, including the Carve-Out (defined below), and adequate protection payments to Leaders.

G. <u>Relief Essential; Best Interest; Good Cause.</u> The relief requested in the Motion is necessary, essential, and appropriate for continued operations, and for the management,

-8-

maintenance, and preservation, of the Debtor's assets. It is in the best interest of the Debtor's

estate for the Debtor to be allowed to use Cash Collateral and obtain financing pursuant to this

Interim Order. Good cause has been shown for the relief requested in the Motion and as granted

in this Interim Order.

H.    Entry of Interim Order. The Debtor has requested the immediate entry of this

Interim Order pursuant to Bankruptcy Rules 4001(b) and (c). The entry of this Interim Order

will minimize disruption of the Debtor's business and will preserve and maintain the assets of

the Debtor's estate, will avoid immediate and irreparable harm to, and is in the best interest of,

the Debtor, its creditors and its estate.

Based upon the foregoing findings and conclusions, and the record before the Court with

respect to the Motion, and good and sufficient cause appearing therefor,

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**

**THAT**:

1.    Motion Granted. The Motion is hereby granted in accordance with the terms and

conditions set forth in this Interim Order on an interim basis; provided, however, that relief

granted in paragraphs 5, 9 and 16 shall be final upon entry of this Interim Order.

2.    Authorization to Use of Cash Collateral. The Debtor is hereby authorized to use

the Prepetition Lenders' Cash Collateral to pay the ordinary and reasonable expenses of

operating its business in accordance the terms of this Interim Order and the budget attached

hereto as Exhibit 2 (the "Budget").

3.    Prior Cash Collateral Order Superseded. The *Interim Order (A) Authorizing the*

*Debtor to Use Cash Collateral (B) Granting Adequate Protection, (C) Scheduling a Final*

*Hearing, and (D) Granting Related Relief* [Docket No. 34] (the "Cash Collateral Order") is

35011.1 495699v7

hereby superseded by this Interim Order and shall be of no further force and effect from and after the entry of this Interim Order.

4.   DIP Loan Authorization.

(a)   *Approval of Entry into DIP Loan Agreement.*  The Debtor is expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Loan Agreement and to incur and to perform the DIP Loan in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Agreement, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Loan and the creation and perfection of Leader's liens described in and provided for by this Interim Order and the DIP Loan Agreement.  The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Agreement, which acts and payments shall not be subject to or require further approval of the Court.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be applied as required by this Interim Order and DIP Loan Agreement.  Upon execution and delivery, the DIP Loan Agreement shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms.

(b)   *Authorization to Borrow.*  Subject to the terms, conditions, limitations on availability, and reserves set forth in the DIP Loan Agreement and this Interim Order, upon the execution of the DIP Loan Agreement, and in accordance with the Budget, the Debtor is hereby authorized to borrow under the DIP Loan up to the aggregate amount of $600,000.00, inclusive of any principal, interest, fees, overdrafts and other charges honored by Leaders between the Petition Date and the date of this Interim Order.

35011.1 495699v7

(c)     *Use of DIP Loan Proceeds*.   The Debtor is authorized to use the DIP

Loan only for the purposes specifically set forth in this Interim Order, the DIP Loan Agreement

and in compliance with the Budget, including, subject to the Carve-Out, (a) to pay fees, costs and

expenses incurred in connection with the transactions contemplated by the DIP Loan Agreement;

(b) to pay other administration costs incurred in connection with the Chapter 11 Case consistent

with the Budget; (c) to pay for other working capital and general corporate purposes; and

(d) upon entry of the Final Order, to pay the Leaders Prepetition Claim.

(d)     *Maturity of DIP Loan*. The DIP Loan shall mature and become due and

payable (the "Maturity Date") on the occurrence and continuation of an uncured Event of Default

(as set forth in Section 7.01 of the DIP Loan Agreement and in paragraph 15 below), or January

1, 2018, unless extended with the consent of Leaders.

5.     Replacement Liens.

(a)     Subject to the Challenge Period (defined below) and the Carve-Out, as

adequate protection for the DIP Loan and the use of its Cash Collateral, Leaders shall be and

hereby is granted a replacement security interest and lien (the "Leaders Replacement Lien")

upon all assets of the Debtor, whether now existing or hereafter acquired and the proceeds and

products thereof, excluding the PMSI Collateral (collectively, the "Post-Petition Collateral").

(b)     Subject to the Challenge Period and the Carve-Out, as adequate protection

for the use of its Cash Collateral, Byline shall be and hereby is granted replacement security

interests and liens upon the PMSI Collateral, to the extent of any diminution in the value of the

PMSI Collateral from and after the Petition Date (the "Byline Replacement Lien" and

collectively with the Leaders Bank Replacement Lien, the "Replacement Liens").

35011.1 495699v7

(c)    The Replacement Liens shall exclude avoidance actions of the Debtor's estate arising under chapter 5 of the Bankruptcy Code and all proceeds thereof and commercial tort claims.  Nothing herein shall be deemed to alter or affect any valid, prepetition security interests in or liens on the Debtor's assets held by any secured creditor other than the Prepetition Lenders.  For the avoidance of doubt, the Replacement Liens shall have same priority as existed prior to the Petition Date.

6.    Superpriority Claim as to Leaders.  Subject to the Challenge Period and the Carve-Out, Leaders is hereby granted an allowed superpriority administrative expense claim in this Chapter 11 Case, as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code (the "Superpriority Claim").  The Superpriority Claim shall exclude avoidance actions of the Debtor's estate arising under chapter 5 of the Bankruptcy Code and all proceeds thereof, and shall not prime, alter or affect the priority of any valid, prepetition security interests in or liens on the Debtor's assets held by any secured creditor that were, as of the Petition Date, senior in priority to the Leaders Prepetition Liens.

7.    Adequate Protection Payments to Leaders.  The Debtor shall pay to Leaders (a) monthly payments of interest, reasonable fees and other amounts due under the DIP Loan, and (b) Leaders' reasonable fees, costs and expenses, including, without limitation, legal and other professional fees and expenses.

8.    Carve-Out.    As used in this Interim Order and the DIP Loan Agreement, the term "Carve-Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C § 1930(a); (ii) fees and expense of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) allowed and unpaid

claims for unpaid fees, costs, and expenses of professionals retained by the Debtor or the Committee in an amount not to exceed $300,000, as set forth in the Budget.

9.    Perfection of Replacement Liens.  The Replacement Liens (a) are and shall be in addition to the Prepetition Liens; (b) are and shall be deemed properly perfected, valid and enforceable liens without any further action by the Debtor, Leaders or Byline and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents and instruments; and (c) shall remain in full force and effect notwithstanding any subsequent conversion to chapter 7 or dismissal of the Chapter 11 Case.  Although not required, upon request by the Prepetition Lenders, the Debtor shall execute and deliver any and all UCC Financing Statements, UCC Continuation Statements, or other instruments or documents considered by the Prepetition Lenders to be reasonably necessary in order to perfect the Replacement Liens and proceeds granted by this Interim Order, and the Prepetition Lenders are authorized to receive, file and record the foregoing at its own expense, which actions shall not be deemed a violation of the automatic stay embodied in section 362 of the Bankruptcy Code. The Prepetition Lenders, in their discretion, may file a photocopy of this Interim Order as a financing statement or other evidence of the perfection of their respective Replacement Liens, with any recording officer designated to file financing statements or with any registry of deeds, and in such event, the recording officer shall be authorized to file or record such copy of this Interim Order.

10.    Additional Covenants and DIP Protections:  Without in any manner limiting the terms of the DIP Loan Agreement or this Interim Order:

(a)    upon reasonable notice, the Debtor shall provide Leaders and its respective representatives with access to the Debtor's premises, personnel (including, but not

limited to, senior management and any chief restructuring officer or similar person or firm employed by the Debtor in this Chapter 11 Case), advisors, books and records and the Post-Petition Collateral, and the Debtor shall cooperate fully in all requests for information and data made by Leaders;

(b)    the Debtor shall promptly (and in any event within one (1) business day after its receipt thereof) provide to Leaders copies of any correspondence, demands, notices, complaints, or process sent to the Debtor by any Federal or State governmental agency;

(c)    the Debtor shall not propose, file, support, or pursue confirmation of a Chapter 11 plan unless such plan provides for the payment in full in cash of all obligations owed to Leaders and is approved by Leaders.

11.    <u>Post-Petition Collateral Rights</u>.  Unless Leaders has provided its prior written consent or all the DIP Loan has been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), and all commitments to lend have terminated, there shall not be entered in this Chapter 11 Case, or in any subsequent chapter 7 case, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code, that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Post-Petition Collateral which is equal or senior to those granted to Leaders; or

(b)    absent approval of the Court on notice to Leaders, relief from stay by any person holding or asserting liens junior to the liens of Leaders on all or any portion of the Post-Petition Collateral.

12.     Disposition of Post-Petition Collateral.  The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Post-Petition Collateral, without the prior written consent of Leaders (and no such consent shall be implied, from any other action, inaction or acquiescence by Leaders or an order of the Court), except: (i) in connection with the proposed Sale, (ii) as otherwise provided for in the DIP Loan Agreement and this Interim Order, or (iii) as otherwise approved by the Court and consented to by Leaders.

13.     Waivers.

(a)     Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case at any time shall be charged against the Prepetition Lenders pursuant to sections 105 or 506(c) of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Prepetition Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

(b)     Upon entry of the Final Order, the Debtor shall waive (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (ii) the equitable doctrine of "marshaling" or any similar doctrine.

14.     Rights and Remedies Upon Maturity of DIP Loan.  Immediately upon the Maturity Date, Leaders may declare (i) all amounts due and owing under the DIP Loan Agreement to be immediately due and payable, (ii) the termination of any further commitment to extend credit to the Debtor, and/or (iii) the termination of any future liability or obligation of Leaders under the Leaders Notes, but without affecting any of the Leaders Prepetition Liens or the remedies provided thereunder (any such declaration by Leaders shall be referred to herein as

a "Termination Declaration"). The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtor, counsel to Leaders, counsel to the Committee, and the U.S. Trustee (the date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date").

15.    Events of Default. The occurrence of any one or more of the Events of Default set forth in Section 7.01 of the DIP Loan Agreement shall constitute an event of default under this Interim Order, unless expressly waived in writing by Leaders.

16.    Challenge Rights. The stipulations and admissions contained in this Interim Order, including the Debtor's Stipulations, shall be binding on the Debtor in all circumstances. The Debtor's Stipulations shall be binding on the Debtor's estate and every party in interest, including, without limitation, the Committee, unless, and solely to the extent that (a) any such party in interest, including the Committee, with standing and requisite authority, has timely commenced an adversary proceeding (subject to the limitations set forth below) against the Prepetition Lenders (i) in connection with any matter related to the Prepetition Loans or the Prepetition Collateral (a "Challenge Proceeding") by no later than 75 days after the entry of the Cash Collateral Order (i.e., November 2, 2017) (the "Challenge Period") or (ii) any other claims or causes of action against the Prepetition Lenders. The Challenge Period may only be extended with the written consent of the Prepetition Lenders or by the order of the Court. If a Challenge Proceeding is timely commenced, the admissions and stipulations contained in this Interim Order, including the Debtor's Stipulations, shall nonetheless remain binding and preclusive (as provided in this paragraph) on the Debtor, the Committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged (pursuant to a final order) in such Challenge Proceeding. Nothing in this Interim Order vests or confers on

-16-

any Person (as defined in the Bankruptcy Code), including the Committee, standing or authority

to pursue any cause of action belonging to the Debtor or its estate, including, without limitation,

claims and defenses with respect to the Prepetition Loans or the Prepetition Collateral.  For the

avoidance of doubt, any trustee appointed or elected in this Chapter 11 Case shall, until the

expiration of the Challenge Period and thereafter for the duration of any adversary proceeding or

contested matter commenced pursuant to this paragraph (whether commenced by such trustee or

commenced by any other party in interest on behalf of the Debtor's estate), be deemed to be a

party other than the Debtor and shall not, for purposes of such adversary proceeding or contested

matter, be bound by acknowledgements, admissions, confirmations, stipulations and waivers of

the Debtor in this Interim Order.

17.    Other Rights and Obligations.

(a)    *Good Faith Under Section 364(e) of the Bankruptcy Code; No
Modification or Stay of Final Order*.  Based on the findings set forth in this Interim Order and in

accordance with section 364(e) of the Bankruptcy Code, with respect to amounts advanced

pursuant to this Interim Order, in the event any or all of the provisions of this Interim Order are

hereafter reversed or modified by a subsequent order of this or any other Court, Leaders is

entitled to the protections provided in section 364(e) of the Bankruptcy Code and, provided that

the Interim Order is not stayed pending appeal, no such reversal or modification shall affect the

validity and enforceability of any advances made under the DIP Loan or the liens or priority

authorized or created hereby.  Notwithstanding any such reversal or modification, any claim

granted to Leaders hereunder arising prior to the effective date of such reversal or modification

of any protections granted to Leaders shall be governed in all respects by the original provisions

of this Interim Order, and Leaders shall be entitled to all of the rights, remedies, privileges and

-17-

benefits, including protections granted herein, with respect to any such claim, provided that the Interim Order was not stayed at the time the claim arose. Since the loans made pursuant to the DIP Loan Agreement are made in reliance on this Interim Order, the obligations owed Leaders prior to the effective date of any reversal or modification of this Interim Order cannot, as a result of any subsequent order in this Chapter 11 Case or any subsequent chapter 7 case, be subordinated, lose their lien priority, or be deprived of the benefit of the status of the liens and claims granted to Leaders under this Interim Order and/or the DIP Loan Agreement, provided that the Interim Order was not stayed.

(b)    *Binding Effect.* All of the provisions of this Interim Order shall be binding upon the Debtor, the Committee, all other creditors of the Debtor, and all other parties in interest, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) whether in this Chapter 11 Case or any subsequent chapter 7 case, or upon dismissal of the Chapter 11 Case or any chapter 7 case, except as otherwise provided herein.

(c)    *No Waiver.* The failure of Leaders to seek relief or otherwise exercise its rights and remedies, as applicable, under the DIP Loan Agreement, this Interim Order or otherwise, shall not constitute a waiver of any of such party's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of Leaders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of Leaders to (i) request conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the appointment of a trustee in the Chapter 11 Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code

-18-

and this Interim Order, a plan of reorganization, or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable or otherwise) Leaders may have pursuant to this Order, the DIP Loan Agreement, or applicable law.

(d)     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

(e)     *Amendment of DIP Loan Agreement*.  The Debtor and Leaders may amend or waive any provision of the DIP Loan Agreement on notice to the U.S. Trustee, counsel to the Committee and counsel to Byline provided that such amendment or waiver, in the reasonable judgment of the Debtor and Leaders, is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the DIP Loan Agreement shall be effective unless set forth in writing, signed by the Debtor and Leaders.

18.     Limitation of Liability.  In determining to provide the DIP Loan or enforcing the rights and remedies afforded to such parties under this Interim Order and/or the DIP Loan Agreement, Leaders shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§9601 *et seq*. as amended , or any similar federal statute).  Furthermore, nothing in this Interim Order or in the DIP Loan Agreement shall in any way be construed or interpreted to impose or allow the imposition upon Leaders any liability for any claims arising from the prepetition or post-petition activities of the Debtor.

19.    <u>Survival of Interim Order</u>.    Except as otherwise provided herein, all of the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Chapter 11 plan in the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing the Chapter 11 Case, (iv) withdrawing of the reference of the Chapter 11 Case from the Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in the Court.    The terms and provisions of this Interim Order, including the protections granted to Leaders pursuant to this Interim Order and the DIP Loan Agreement, shall continue in full force and effect notwithstanding the entry of such order, and protections for other parties shall maintain their priority as provided by this Interim Order until all the obligations of the Debtor to Leaders pursuant to the DIP Loan Agreement and this Interim  Order have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Loan which survive such discharge by their terms).

20.    <u>Inconsistency</u>.    In the event of any inconsistency between the terms and conditions of the DIP Loan Agreement and of this Interim Order, the provisions of this Interim Order shall govern and control.

21.    <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim  Order.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and

-20-

enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

22.    No Waivers or Modification of Interim Order.  The Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of Leaders and no such consent shall be implied by any other action, inaction or acquiescence of Leaders.

23.    Headings.  All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

24.    Retention of Jurisdiction.  The Court has and will retain jurisdiction (i) to enforce this Interim Order and (ii) over any proceedings commenced by Leaders following an Event of Default under the DIP Loan Agreement to the extent necessary to allow the Leaders to obtain repayment of the DIP Loan.

25.    Notice of Final Hearing.  The Final Hearing is scheduled for December 21, 2017 at 1:30 p.m. (Central time) before the Honorable Janet S. Baer in Courtroom 615 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, and may be continued from time to time without further notice other than that given in open Court. The Debtor is directed to serve a copy of this Interim Order by first class mail on the Notice Parties within two (2) days of entry, which service shall constitute adequate and proper notice of the Final Hearing.  A proposed form of Final Order shall be filed with the Court no later than December 18, 2017.  Any objections or responses to the Final Order must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be

filed and served on (i) the Debtor, through its proposed counsel, Cullen and Dykman LLP, Attn: S. Jason Teele, Esq. and Nicole Stefanelli, Esq., The Legal Center, One Riverfront Plaza, Newark, New Jersey 07102 and (ii) the Office of the United States Trustee for the Northern District of Illinois, Attn: Ha Nguyen, Esq., 219 South Dearborn Street, Room 873, Chicago, Illinois 60604 so as to actually be received on or before December 20, 2017 at 12:00 p.m. (Central time). Any timely and properly filed and served objection will be heard at the Final Hearing.

Dated: November 30, 2017
      Chicago, Illinois

                      THE HONORABLE JANET S. BAER
                      UNITED STATES BANKRUPTCY JUDGE

35011.1 495699v7

**<u>Exhibit 1</u>**

**DIP Loan Agreement**

**POSTPETITION CREDIT AGREEMENT**
**PURSUANT TO SECTIONS 364(c)(1), (2) AND (3) OF**
**BANKRUPTCY CODE**

The Leaders Bank
2001 York Rd, Suite 150
Oak Brook, IL 60523

Tec-Air, Inc.
9200 Calumet Ave
Munster, IN 46321

Ladies/Gentlemen:

THIS POSTPETITION CREDIT AGREEMENT (the "Agreement") dated as of November
__, 2017 by and between TEC-AIR, INC., an Illinois corporation with a principal address
of 9200 Calumet Ave, Munster, IN 46321 (the "Company"), and THE LEADERS BANK,
an Illinois banking corporation with a principal address of 2001 York Rd, Suite 150, Oak
Brook, IL 60523 (the "Bank"; and together with the Company, the "Parties", each being
a "Party") pursuant to which Bank agrees to establish a revolving line of credit for the
Company on all the terms and conditions set forth below.

**RECITALS:**

WHEREAS, the Parties have previously entered into that certain:

(i)     Loan and Security Agreement dated August 24, 2007;

(ii)    First Amendment to Loan and Security Agreement dated May 14, 2008
(the "First Amendment");

(iii)   Second Amendment to Loan and Security Agreement and Loan
Documents dated September 30, 2008 (the "Second Amendment");

(iv)    Third Amendment to Loan Documents dated as of April 23, 2009 (the
"Third Amendment");

(v)     Fourth Amendment to Loan Documents dated June 22, 2009 (the "Fourth
Amendment");

(vi)    Fifth Amendment to Loan Documents dated as of September 25, 2009
(the "Fifth Amendment");

(vii)   Sixth Amendment to Loan Documents dated as of March 2010 (the "Sixth
Amendment");

(viii)   Seventh Amendment to Loan Documents dated as of January 1, 2011 (the "Seventh Amendment") (N.B. an Eighth Amendment to Loan Documents was never executed);

(ix)    Ninth Omnibus Amendment to Loan Documents dated as of May 28, 2015 (the "Ninth Amendment");

(x)    Forbearance Agreement dated April 26, 2016 (the "Forbearance Agreement"); and

(xi)    First Modification to Forbearance Agreement effective as of May 28, 2017 (the "First Forbearance Modification", and collectively with the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Seventh Amendment, the Ninth Amendment, and Forbearance Agreement are the "Prepetition Credit Agreement").

WHEREAS, pursuant to the Prepetition Credit Agreement, the Company has issued that certain:

(i)    Amended, Restated and Consolidated Term Note dated May 28, 2015 made by the Company in the original principal amount of $7,201,881.63 (the "Consolidated Note"); and

(ii)    Term Note A dated April 26, 2016 made by the Company in the original principal amount of $600,000 (the "Term Note A" and together with the Consolidated Note are the "Prepetition Notes").

Pursuant to the Prepetition Notes, the Company is indebted to the Bank under the Prepetition Credit Agreement for borrowed money in the original aggregate principal outstanding amount of $7,801,881.63 (the "Prepetition Indebtedness"), which Prepetition Indebtedness is represented by the Prepetition Notes.

The Company acknowledges and agrees that the obligations under the Prepetition Credit Agreement and the Prepetition Notes exist and are due and owing with no offset, defense or counterclaim assertable by the Company and that the Prepetition Credit Agreement, Prepetition Notes and Prepetition Collateral Documents (as hereinafter defined) are valid, binding and fully enforceable according to their respective terms.

WHEREAS, the Parties have entered into the Prepetition Credit Agreement, pursuant to which the Bank agreed to make certain loans to the Company, subject to the terms and conditions contained therein.

WHEREAS, the Company's debts, obligations and liabilities under the Prepetition Credit Agreement are secured by security interests in substantially all the Company's assets, tangible or intangible, (the "Prepetition Collateral"), pursuant to that certain:

(i)     Security Agreement and Collateral Assignment under Land Trust dated August 24, 2007 (the "<u>Security Agreement</u>");

(ii)    Standard Assignment of Multi-Buyer Export Credit Insurance Policy no. ESC-407800 dated August 27, 2007 by and among Tec Air, Bank and the Export-Import Bank of the United States (the "<u>EX-IM Assignment</u>");

(iii)    Guaranty of Payment dated August 24, 2007 made by Robert J. McMurtry ("<u>McMurtry</u>") in favor of the Bank (the "<u>Guaranty</u>") made by Robert in favor of Bank; and

(iv)    Request for Collateral Assignment/Discharge of Assignment dated June 29, 2017 executed by McMurtry and The Prudential Life Insurance Company of America relating to policy number L9457646, and limited to $1,000,000 (the "Life Insurance Assignment", and together with the Security Agreement, the EX-IM Assignment, and the Guaranty are collectively referred to hereinafter as the "<u>Prepetition Collateral Documents</u>").

WHEREAS, the principal amount of loans outstanding under the Prepetition Credit Agreement as of the Petition Date, (as hereinafter defined) is not less than $5,463,793.53; and

WHEREAS, on October 17, 2017 (the "<u>Petition Date</u>") the Company filed a Voluntary Petition for Relief under Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Northern District of Illinois (the "<u>Bankruptcy Court</u>"), captioned as In re: Tec-Air, Inc. (Case No. 17-32273).

WHEREAS, on November __, 2017 the Bankruptcy Court judge approved that certain order titled "Order Authorizing Debtor to (A) Use Cash Collateral on an Interim Basis Pending A Final Hearing; (B) Incur Postpetition Debt on an Interim Basis Pending A Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to The Leaders Bank" (the "<u>Order</u>").

WHEREAS, the Company is continuing to manage its properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, an immediate need exists for the Company to obtain funds to continue the operation of its business.

WHEREAS, the Company has requested that the Bank make funds available for the purposes described in Section 1.02 hereof.

WHEREAS, the Bank is willing to make funds available pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code for the aforementioned purposes, but only upon the terms and subject to the conditions contained herein.

WHEREAS, the Company has agreed to secure its obligations to the Bank in connection with such financing with a security interest in and lien on substantially all of its property, rights and interests, whether real or personal, tangible or intangible, each to the extent set forth herein, excluding recoveries by the Company of avoidable transfers to persons other than the Bank pursuant to Sections 544-551 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the Company hereby requests that the Bank lend the Company up to $600,000 as a non-revolving line of credit (the "Postpetition Facility").

Such loans shall be on the terms and conditions set forth below:

## Article I.   LOANS AND NOTE

### Section 1.01   Non-Revolving Credit.

From time to time prior to January ___, 2018, or the earlier termination in full of the Postpetition Facility (in either case the "Termination Date"), and subject to all of the terms and conditions of this Agreement, the Lender may, in its sole discretion, make Loans (as hereinafter defined) to the Company, provided in each case that, after giving effect to each requested Loan,

(i)   the aggregate outstanding principal amount of the Loans shall not exceed the amount of the Postpetition Facility, and

(ii)   All such Loans shall be evidenced by the Note (as hereinafter defined). The Note shall be executed by the Company and delivered to the Bank prior to the initial Loan. Although the Note shall be expressed to be payable in the full amount specified above, the Company shall be obligated to pay only the amounts actually disbursed to or for the account of the Company, together with interest on the unpaid balance of sums so disbursed which remains outstanding from time to time, at the rates and on the dates specified herein or in the Note, and together with the other amounts provided herein.

### Section 1.02   Use of Proceeds.

The Company represents, warrants and agrees that the proceeds of the loans hereunder will be used solely as provided in the Order in accordance with the budget attached hereto as Exhibit B (the "Budget") and that none of such proceeds will be used to "purchase" or "carry" "margin stock" (as such terms are used in Regulation U of the Federal Reserve Board).

**Section 1.03**       <u>Perfection of Security Interests, Mortgages and Liens</u>.

At the request of the Bank, the Company shall execute and deliver to the Bank such further documentation satisfactory to the Bank evidencing the security interests, mortgages and liens granted pursuant to the Postpetition Collateral Documents and providing for the perfection of such security interests, mortgages and liens, and the automatic stay provisions of Section 362 of the Bankruptcy Code are modified to permit this execution, delivery and filing of such documentation; <u>provided</u>, <u>however</u>, that no such documentation shall be required as a condition to the validity, priority or perfection of any of the security interests, mortgages or liens created pursuant to the Postpetition Collateral Documents. The claims arising under this Agreement and the Postpetition Loan Documents, including without limitation all accrued interest, fees, costs and expenses, shall constitute in accordance with Sections 364(c)(1) (c)(2) and (c)(3)of the Bankruptcy Code, a claim having priority over any and all costs and expenses of the kinds specified in or ordered pursuant to Sections 503(b) or 507(b) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that such priority shall be subordinate to reasonable administrative claims of the Company's professionals in the amount approved by the court, but in any event not to exceed the amount specified in the Interim Order and Final Order, and to quarterly fees of the U.S. Trustee.

**Section 1.04**       <u>Application of Payments.</u>

All payments and prepayments hereunder shall be applied as provided in the Order.

## Article II.   ADMINISTRATION OF CREDIT

**Section 2.01**       <u>Interest on Loans</u>.

The unpaid principal balance of the Note shall bear interest at the interest rate (the "<u>Interest Rate</u>") equal to the *greater* of: (i) the Prime Rate <u>plus</u> 4% per annum or (ii) 8% per annum. As used herein, "<u>Prime Rate</u>" means the highest "prime rate" of interest published in *The Wall Street Journal* from time to time in effect, on a floating per annum basis, changing effective immediately on the publication of each change in the "prime rate." If *The Wall Street Journal* fails or discontinues publishing a "prime rate," then the Prime Rate means the base or prime rate the Bank announces, from time to time. The Prime Rate is not necessarily the best or lowest rate charged by the Bank. The Bank is not required to give notice of a change in the Prime Rate.

**Section 2.02**       <u>Borrowing Procedure</u>.

Loans hereunder shall be made (subject to the other provisions hereof) when the Bank advances funds in an amount not to exceed the sum of (a) checks or other drafts presented for payment, (b) wire transfers made on behalf of the Company, (c) interest payable pursuant hereto and (d) fees and expenses as provided herein. By making such advances, the Bank shall be making loans to the Company pursuant to the Postpetition Facility, in the total amount of the advances so made. All payments by the

Company of principal and interest under this Agreement and the Note shall be made to the Bank in immediately available funds.

### Section 2.03      Computations of Interest.

All computations of interest and other amounts due under the Note and fees and other amounts due under this Agreement will be based on a 360-day year using the actual number of days occurring in the period for which such interest, fees or other amounts are payable.

### Section 2.04      Interest Following Event of Default.

From and after the occurrence and during the continuance of an Event of Default, the unpaid principal amount of all Loans and all other amounts due and unpaid under this Agreement and the Note will bear interest until paid computed at a rate equal to the Interest Rate plus 5% per annum.

### Section 2.05      Deposits; Set Off.

The Company grants to the Bank, as security for the Note, a lien and security interest in any and all monies, balances, accounts and deposits (including certificates of deposit) of the Company at the Bank now or at any time hereafter. If any Event of Default occurs hereunder or any attachment of any balance of the Company occurs, the Bank may offset and apply any such security toward the payment of the Note, whether or not such Note, or any part thereof, shall then be due. Promptly upon its charging any account of the Company pursuant to this section, the Bank shall give the Company notice thereof.

### Section 2.06      Loan Fee.

In addition to the other amounts payable by the Company to the Bank hereunder, on the Termination Date, the Company shall also pay to the Bank a loan fee ("Loan Fee") in the amount of 2% of the full amount of the Postpetition Facility, which Loan Fee shall be deemed, as of the date of this Agreement, fully-earned by the Bank and non-refundable to the Company.

## Article III.    CONDITIONS OF BORROWING

Without limiting any of the other terms of this Agreement, the Bank shall not be required to make any loan to the Company hereunder:

### Section 3.01      Representations.

Unless the representations and warranties contained in Article IV hereof continue to be true and correct on the date of such Loan; no Default or Event of Default hereunder shall have occurred and be continuing; there has been no material adverse change in the business operations or financial condition of the Company since the Petition Date;

and the Bank shall have received all the information required by <u>Section 6.01</u> as and when required by that section.

**Section 3.02**        <u>**Collateral Documents**</u>.

Unless the Prepetition Collateral Documents shall continue to remain in full force and effect, and which Prepetition Collateral Documents, together with such other security agreements, mortgages, guaranties, pledges, documents and instruments as the Bank shall reasonably require and which are set forth in the Order, shall secure the Loans evidenced by the Note (the foregoing, along with the Prepetition Collateral Documents are collectively the "<u>Postpetition Collateral Documents</u>", each being a "<u>Postpetition Collateral Document</u>").

**Section 3.03**        <u>**Filings**</u>.

Unless any documents (including, without limitation, financing statements) required to be filed, registered or recorded in order to create, in favor of the Bank, perfected security interests in the collateral in the jurisdictions listed in the Prepetition Collateral Documents shall have been properly filed, registered or recorded in each office in each such jurisdiction which such filings, registrations and recordations are required; the Bank shall have received acknowledgment copies of all such filings, registrations and recordations stamped by the appropriate filing, registration or recording officer (or, in lieu thereof, other evidence satisfactory to the Bank that all such filings, registrations and recordations have been made); and the Bank shall have received such evidence as it may deem satisfactory that all necessary filing, recording and other similar fees, and all taxes and other expenses related to such filings, registrations and recordings have been paid in full.

**Section 3.04**        <u>**Priority**</u>.

Unless the Bank shall have received, in form and substance satisfactory to the Bank, such lien searches, title insurance policies and other evidence of lien priority covering the security interest granted to the Bank hereunder or under the Postpetition Collateral Documents, as the Bank may require.

**Section 3.05**        <u>**Insurance Certificate**</u>.

Unless prior to the initial loan the Bank shall have received evidence satisfactory to it that the Company maintains hazard and liability insurance coverage reasonably satisfactory to the Bank.

**Section 3.06**        <u>**Interim Order**</u>.

Unless prior to the initial loan hereunder, the Bank shall have received a true copy of the Interim Order, which order shall be in full force and effect and shall not have been stayed, vacated, reversed, modified, supplemented or amended and in the event the

Interim Order is the subject of any pending motion or appeal, no performance of any obligation of any party hereto shall have been stayed pending the final resolution of motion or appeal.

**Section 3.07** **Board Resolutions.**

Unless the Bank shall have received, prior to the initial loan hereunder, certified copies of the resolutions of the Board of Directors of the Company, approving agreements substantially on the terms of each of the Postpetition Loan Documents and the transactions contemplated thereby.

**Section 3.08** **Proceedings Satisfactory.**

Unless all proceedings taken in connection with the transactions contemplated by this Agreement, and the instruments, authorizations and other documents applicable thereto, including the Interim Order, the Final Order, UCC Financing Statement and other lien filings, shall be satisfactory in form and substance to the Bank and its counsel.

## Article IV.    REPRESENTATIONS AND WARRANTIES

In order to induce the Bank to make the loans as provided herein, the Company represents and warrants to the Bank as follows as of the date of this Agreement and each request by the Company for a loan or other extension of credit hereunder shall constitute a representation and warranty by the Company that all such representations and warranties remain true on and as of the date of such requested loan or extension of credit:

**Section 4.01** **Organization.**

The Company is a corporation duly organized and existing in good standing or active status under the laws of the State of Illinois, and has all requisite power and authority, corporate or otherwise, to conduct its business and to own its properties. The Company has no subsidiary.

**Section 4.02** **Authority.**

The execution, delivery and performance of this Agreement, the Note and the documents required by Article III (the "Collateral Documents") are within the corporate powers of the Company and have been duly authorized by all necessary corporate action.

**Section 4.03** **Margin Stock.**

The assets of the Company do not include nor does the Company have any intent of acquiring any margin stock.

**Section 4.04        Full Disclosure.**

No information, exhibit or report furnished by the Company to the Bank or filed with the Bankruptcy Court contained any material misstatement of fact as of the date when made or omitted to state a material fact or any fact necessary to make the statements contained therein not misleading as of the date when made.

### Article V.    NEGATIVE COVENANTS

While any part of the credit granted to the Company is available and while any part of the principal of or interest on the Note remains unpaid, the Company shall not do any of the following, without the prior written consent of the Bank:

**Section 5.01        Restriction of Indebtedness.**

Create, incur, or assume any indebtedness for borrowed money or the deferred purchase price of any asset (including obligations under Capitalized Leases), except the Prepetition Notes and the Note issued under this Agreement.

**Section 5.02        Restriction on Liens.**

Create or permit to be created any mortgage, pledge, encumbrance or other lien upon or security interest in any property or asset now owned or hereafter acquired by the Company, except Permitted Liens.

### Article VI.    AFFIRMATIVE COVENANTS

While any part of the credit granted to the Company is available and while any part of the principal of or interest on the Note remains unpaid, and unless waived in writing by the Bank, the Company shall:

**Section 6.01        Accounting Records; Reports.**

Maintain a standard and modern system for accounting in accordance with generally accepted principles of accounting consistently applied throughout all accounting periods; and furnish to the Bank such information respecting the business, assets and financial condition of the Company as the Bank may reasonably request and, without request, furnish to the Bank the following by 11:00 A.M. Central Time Wednesday of each week for the preceding calendar week:

(a)    An inventory report of the Company;

(b)    An aging of accounts receivable;

(c)    An aging of accounts payable; and

(d)    A cash flow report with a comparison of actual cash flow to the Budget.

**Section 6.02**    <u>Insurance</u>.

Maintain insurance in such amounts and against such risks as is customary by companies engaged in the same or similar businesses and similarly situated, with loss payee, additional insured, and mortgagee language satisfactory to the Bank.

**Section 6.03**    <u>Corporate Existence; Obligations</u>.

Do all things necessary to: (i) maintain its corporate existence and all rights and franchises necessary or desirable for the conduct of its business; (ii) comply with all applicable laws, rules, regulations and ordinances, and all restrictions imposed by governmental authorities, including those relating to environmental standards and controls; and (iii) pay, before the same become delinquent and before penalties accrue thereon, all taxes, assessments and other governmental charges against it or its property, except to the extent and so long as the same are being contested in good faith by appropriate proceedings in such manner as not to cause any material adverse effect upon its property, financial condition or business operations.

**Section 6.04**    <u>Inspection of Records</u>.

Permit representatives of the Bank to visit and inspect any of the properties and examine any of the books and records of the Company at any reasonable time and as often as may be reasonably desired.

**Section 6.05**    <u>Orders, Decrees and Other Documents</u>.

Provide to the Bank, immediately upon receipt, copies of any correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a circumstance or condition which requires or may require a financial contribution by the Company or a cleanup, removal, remedial action, or other response by or on the part of the Company under environmental laws or which seeks damages or civil, criminal or punitive penalties from the Company for an alleged violation of environmental laws.

### Article VII.    DEFAULTS

**Section 7.01**    <u>Defaults</u>.

The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)    The Company shall fail to pay (i) any interest due on the Note, or any other amount payable hereunder (other than a principal payment on the Note) by

three (3) days after the same becomes due; or (ii) any principal amount due on any Note when due;

(b)    The Company shall default in the performance or observance of any agreement, covenant, condition, provision or term contained in Article V or Section 6.01 of this Agreement;

(c)    The Company or other signatory other than the Bank shall default in the performance or observance of any of the other agreements, covenants, conditions, provisions or terms in this Agreement or any of the Collateral Documents continuing for a period of thirty days after written notice thereof is given to the Company by the Bank;

(d)    Any representation or warranty made by the Company herein or any certificate delivered pursuant hereto, or any financial statement delivered to the Bank hereunder, shall prove to have been false in any material respect as of the time when made or given;

(e)    A final judgment which, together with other outstanding final judgments against the Company exceeds an aggregate of $10,000 shall be entered against the Company and shall remain outstanding and unsatisfied, unbonded, unstayed or uninsured after 60 days from the date of entry thereof; or any judgment which exceeds $20,000 shall be entered against the Company;

(f)    Any Lien purported to be created by any Postpetition Loan Document or any Authorizing Order in any of the collateral secured by the Postpetition Collateral Documents purported to be covered thereby shall, for any reason, cease to be valid;

(g)    Entry of an order of the Bankruptcy Court converting the chapter 11 case of the Company to a case under chapter 7 of the Bankruptcy Code;

(h)    Entry of an order of the Bankruptcy Court dismissing or suspending the chapter 11 case of the Company;

(i)    Entry of an order of the Bankruptcy Court in the Company's chapter 11 case appointing a trustee under Section 1104 of the Bankruptcy Code which the Bank reasonably determine may result in events which are materially injurious to the interests of the Bank;

(j)    Entry of an order of the Bankruptcy Court granting relief from the automatic stay to the holder of a lien on, or security interest in, any other asset the removal of which from the Company's bankruptcy estate may have a material adverse effect on the value or operation of the Company's business;

(k)    Any Authorizing Order shall terminate by its terms, shall not remain in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in a manner which the Bank reasonably believes is materially injurious to its interests, or, in the event that any such order is the subject of any pending motion or appeal, any performance of any obligation of any party hereto shall have been stayed pending such motion or appeal;

(l)    The Final Order shall not have been issued prior to the earlier of (i) the next Business Day after the date the Final Hearing is concluded or (ii) the [____] day after the Petition Date or shall fail to approve and affirm the Interim Authorizing Order in all respects;

(m)    The aggregate principal amount outstanding under the Note exceeds the amount of the Postpetition Facility, and the Company fails to immediately repay the amount of such excess;

(n)    The Company's actual cash flow shall vary from any line item or total on the Budget by more than 10%; or

(o)    This Agreement, the Note or any Postpetition Collateral Document shall, at any time after their respective execution and delivery, and for any reason, cease to be in full force and effect or be declared null and void, or be revoked or terminated, or the validity or enforceability thereof or hereof shall be contested by the Company or any guarantor, or the Company or any guarantor shall deny that it has any or further liability or obligation thereunder or hereunder, as the case may be.

**Section 7.02**        **Termination of Commitment and Acceleration of Obligations.**

Upon the occurrence of any Event of Default, and except as otherwise provided in an Interim Order or Final Order:

(a)    As to any Event of Default and at any time thereafter, and in each case, the Bank may, without notice, immediately terminate the Postpetition Facility and/or declare the unpaid principal balance of the Note, together with all interest accrued thereon, to be immediately due and payable; and the unpaid principal balance of and accrued interest on the Note shall thereupon be due and payable without further notice of any kind, all of which are hereby waived, and notwithstanding anything to the contrary herein or in the Note contained; and

(b)    As to each Event of Default, the Bank shall have all the remedies for default provided by the Collateral Documents, as well as applicable law.

## Article VIII.  MISCELLANEOUS

**Section 8.01**      <u>**Accounting Terms; Definitions**</u>.

Except as otherwise provided, all accounting terms shall be construed in accordance with generally accepted accounting principles consistently applied and consistent with those applied in the preparation of the financial statements referred to in <u>Section 4.05</u>, and financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles.  As used herein:

(a)      the term "<u>Authorizing Order</u>" means an Interim Order or a Final Order.

(b)      the term "Bankruptcy Court" has the meaning assigned to such term in the recitals of this Agreement and shall include any United States District Court or other court which determines any matter affecting the interests of the Bank.

(c)      the term "<u>Business Day</u>" means any date other than a Saturday, Sunday or other day on which banks in the State of Illinois are required or authorized to close.

(d)      the term "<u>Capitalized Lease</u>" means any lease which is capitalized on the books of the lessee, or should be so capitalized under generally accepted accounting principles.

(e)      the term "<u>Default</u>" means any condition or event which with the passage of time or the giving of notice or both would constitute an Event of Default.

(f)      the term "<u>Final Order</u>" means an Authorizing Order entered at the conclusion of a Final Hearing.

(g)      the term "<u>Final Hearing</u>" means a hearing at the Bankruptcy Court prior to the Bankruptcy Court entering a Final Order.

(h)      the term "<u>Interim Order</u>" means an Authorizing Order entered at the conclusion of an Initial Hearing and prior to the conclusion of a Final Hearing.

(i)      the term "<u>Initial Hearing</u>" means a hearing on the Company's motion for authority to obtain credit conducted prior to a final hearing pursuant to Bankruptcy Rule 4001(c)(2), notice of which hearing is in form and substance acceptable to the Bank and is provided to those persons identified in Bankruptcy Rule 4001(c)(3) and any additional persons as the Bankruptcy Court may direct.

(j)      the term "<u>Loans</u>" means loans or advances made by the Bank.

(k)      the term "<u>Note</u>" means a promissory note of the Company payable to the order of the Bank a principal amount equal to the Bank's Postpetition Facility, in

substantially the form of <u>Exhibit A</u>, evidencing the aggregate indebtedness of the Company to the Bank resulting from the Postpetition Loans made by the Bank, as such Postpetition Note may be amended, supplemented or otherwise modified from time to time.

(l)      the term "<u>Permitted Liens</u>" means:

(1)      liens outstanding on the Petition Date and described in writing to the Bank on the Company's schedules or otherwise;

(2)      liens for taxes, assessments or governmental charges, and liens incident to construction, which are either not delinquent or are being contested in good faith by the Company by appropriate proceedings which will prevent foreclosure of such liens, and against which adequate reserves have been provided; and easements, restrictions, minor title irregularities and similar matters which have no adverse effect as a practical matter upon the ownership and use of the affected property by the Company;

(3)      liens or deposits in connection with worker's compensation or other insurance or to secure customs' duties, public or statutory obligations in lieu of surety, stay or appeal bonds, or to secure performance of contracts or bids (other than contracts for the payment of money borrowed), or deposits required by law or governmental regulations or by any court order, decree, judgment or rule as a condition to the transaction of business or the exercise of any right, privilege or license; or other liens or deposits of a like nature made in the ordinary course of business; and

(4)      liens required by this Agreement as security for the Note.

(m)     the term "<u>Postpetition Collateral Documents</u>" has the meaning assigned to such term in <u>Section 3.02</u> of this Agreement.

(n)      the term "<u>Postpetition Facility</u>" has the meaning assigned to such term in the Recitals of this Agreement.

(o)      the term "<u>Postpetition Loan Documents</u>" means, collectively, this Agreement, the Note and the Postpetition Collateral Documents.

(p)      the term "<u>Postpetition Obligations</u>" means all present and future obligations and other liabilities of the Company of every type and description arising under this Agreement, or any Postpetition Loan Document, including, without limitation, all obligations in respect of principal, interest, premium, fees, reimbursements, indemnities and charges, and any and all renewals, extensions and refundings of any such Postpetition Obligations or other liabilities.

(q)    the term "Prime Rate" has the meaning assigned to it in Section 2.01 of this Agreement.

**Section 8.02        Expenses; Indemnity.**

(a)    Unless otherwise limited by the Bankruptcy Court in the Interim Order or the Final Order, the Company shall pay or reimburse the Bank for (i) all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) paid or incurred by the Bank in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement, the Note, the Collateral Documents and any other document required hereunder or thereunder, including without limitation any amendment, supplement, modification or waiver of or to any of the foregoing; (ii) all reasonable out-of-pocket costs and expenses paid or incurred by the Bank before and after judgment in enforcing, protecting or preserving its rights under this Agreement, the Note, the Collateral Documents and any other document required hereunder or thereunder, including without limitation the enforcement of rights against, or realization on, any collateral or security therefor or in defending against any claim made against the Bank by the Company, any subsidiary or any third party as a result of or in any way relating to any matter referred to in subsection (i) or (ii) of this section; and (iii) any and all recording and filing fees and any and all stamp, excise, intangibles and other taxes, if any, (including, without limitation, any sales, occupation, excise, gross receipts, franchise, general corporation, personal property, privilege or license taxes, but not including taxes levied upon the net income of the Bank by the federal government or the State of Illinois), which may be payable or determined to be payable in connection with the negotiation, preparation, execution, delivery, administration or enforcement of this Agreement, the Note, the Collateral Documents or any other document required hereunder or thereunder or any amendment, supplement, modification or waiver of or to any of the foregoing, or consummation of any of the transactions contemplated hereby or thereby, whether such taxes are levied by reason of the acts to be performed by the Company hereunder or are levied upon the Bank, the Company, any subsidiary, the property of the Bank or otherwise, including all costs and expenses incurred in contesting the imposition of any such tax, and any and all liability with respect to or resulting from any delay in paying the same, whether such taxes are levied upon the Bank, the Company, any subsidiary, or otherwise.

(b)    Unless limited by the Bankruptcy Court in the Interim Order or the Final Order, the Company agrees to indemnify the Bank against any and all losses, claims, damages, liabilities and expenses, (including, without limitation, reasonable attorneys' fees and expenses, including the fees and expenses of in-house counsel) incurred by the Bank arising out of, in any way connected with, or as a result of (i) any breach or alleged breach by the Company or any subsidiary of or any liability or alleged liability of the Company or any subsidiary under any environmental law, or any liability or alleged liability incurred by the Bank under

any environmental law in connection with this Agreement, any Postpetition Collateral Document or the transactions contemplated hereunder or thereunder, (ii) the negotiation, preparation, execution, delivery, administration, and enforcement of this Agreement, the Note, the Postpetition Collateral Documents and any other document required hereunder or thereunder, including without limitation any amendment, supplement, modification or waiver of or to any of the foregoing or the consummation or failure to consummate the transactions contemplated hereby or thereby, or the performance by the parties of their obligations hereunder or thereunder, (iii) any claim, litigation, investigation or proceedings related to any of the foregoing, whether or not the Bank is a party thereto.

(c)     The foregoing agreements and indemnities shall remain operative and in full force and effect regardless of termination of this Agreement, the consummation of or failure to consummate either the transactions contemplated by this Agreement or any amendment, supplement, modification or waiver, the repayment of any loans made hereunder, the invalidity or unenforceability of any term or provision of this Agreement, the Note or any Postpetition Collateral Document, or any other document required hereunder or thereunder, any investigation made by or on behalf of the Bank, the Company or any subsidiary, or the content or accuracy of any representation or warranty made under this Agreement, any Postpetition Collateral Document or any other document required hereunder or thereunder.

**Section 8.03     Successors.**

The provisions of this Agreement shall inure to the benefit of any holder of one or more of the Note, and shall inure to the benefit of and be binding upon any successor to any of the parties hereto. No delay on the part of the Bank or any holder of the Note in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein specified are cumulative and are not exclusive of any rights or remedies which the Bank or the holder of the Note would otherwise have.

**Section 8.04     Survival.**

All agreements, representations and warranties made herein shall survive the execution of this Agreement, the making of the loans hereunder and the execution and delivery of the Note.

**Section 8.05     Governing Law.**

This Agreement and the Note issued hereunder shall be governed by and construed in accordance with the internal laws of the State of Illinois, except to the extent superseded by federal law.

**Section 8.06        <u>Counterparts</u>.**

This Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.

**Section 8.07        <u>Notices</u>.**

All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth below in this Section or (d) at the option of the Bank, upon delivery, if delivered by email to the last known email address of the recipient of such notice (followed up by delivery with one of the other foregoing methods).  All notices should be addressed as follows (unless and until any of such parties advises the other in writing of a change in such address):  (a) if to the Company, with the full name and address of the Company as shown on this Agreement below; and (b) if to the Bank with the full name and address of the Bank as shown on this Agreement above, to the attention of the officer of the Bank executing the form of acceptance of this Agreement.  Either party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications.

**Section 8.08        <u>Sale; Participations</u>.**

The Bank may, at its option, sell and assign all or any part of its interest in this Agreement, the Note and the Collateral Documents and, in connection with each such sale, and thereafter, disclose to any purchaser or potential purchaser any financial information the Bank may have concerning the Company and its subsidiaries. The Bank shall provide five (5) days advance written notice to Borrower of such assignment.

**Section 8.09        <u>Entire Agreement; No Agency</u>.**

This Agreement and the other documents referred to herein contain the entire agreement between the Bank and the Company with respect to the subject matter hereof, superseding all previous communications and negotiations, and no representation, undertaking, promise or condition concerning the subject matter hereof shall be binding upon the Bank unless clearly expressed in this Agreement or in the other documents referred to herein. Nothing in this Agreement or in the other documents referred to herein and no action taken pursuant hereto shall cause the Company to be treated as an agent of the Bank, or shall be deemed to constitute the Bank and the Company a partnership, association, joint venture or other entity.

**Section 8.10**        No Third Party Benefit.

This Agreement is solely for the benefit of the parties hereto and their permitted successors and assigns. No other person or entity shall have any rights under, or because of the existence of, this Agreement.

**Section 8.11**        Consent to Jurisdiction.

**The Company hereby consents to the exclusive jurisdiction of any state or federal court situated in Cook County, Illinois, and waives any objection based on lack of personal jurisdiction, improper venue or *forum non conveniens*, with regard to any actions, claims, disputes or proceedings relating to this Agreement, any Note, any of the Collateral Documents, or any other document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing. The Company waives personal service of any and all process upon it, and consents to all such service of process made by mail or by messenger directed to it at the address specified below. Nothing herein shall affect the Bank's right to serve process in any manner permitted by law, or limit the Bank's right to bring proceedings against the Company or its property or assets in the competent courts of any other jurisdiction or jurisdictions.**

**Section 8.12**        Waiver of Jury Trial.

**The Company and the Bank hereby jointly and severally waive any and all right to trial by jury in any action or proceeding relating to this Agreement, any Note, any of the Collateral Documents, or any other document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing. The Company and the Bank each represent that this waiver is knowingly, willingly and voluntarily given.**

**Section 8.13**        Limitation of Liability.

**The Company and the Bank hereby waive any right any of them may now or hereafter have to claim or recover from the other any consequential, exemplary or punitive damages.**

**Section 8.15**        USA Patriot Act Notice.

The Bank hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub.L. 107-56, signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow the Bank to identify the Company in accordance with the Act.

[Signature page follows]

IN WITNESS WHEREOF, the parties have caused this Postpetition Credit Agreement to be duly executed by its proper and duly authorized officers as of the day and year first above written.

**TEC-AIR, INC.**,
an Illinois corporation


By: _____
Name: Robert J. McMurtry
Its: President


Agreed and accepted:

**THE LEADERS BANK**, an Illinois state
banking corporation


By: _____
Name: William Navolio
Its: Executive Vice President and General
Counsel


Acknowledged and agreed:


_____
**ROBERT J. MCMURTY**, an individual

EXHIBIT A

PROMISSORY NOTE

$600,000                                                            November [__], 2017

FOR VALUE RECEIVED, TEC-AIR, INC., an Illinois corporation (the "Maker"), promises to pay to the order of THE LEADERS BANK (the "Payee"), without setoff or counterclaim, the principal sum of SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000) at the main office of Payee at 2001 York Rd, Suite 150, Oak Brook, IL 60523, on or before January __, 2018.

The outstanding principal balance hereof shall bear interest computed at a rate equal to the greater of: (i) the Prime Rate plus 4.00% per annum or (ii) 8% per annum, payable on demand. "Prime Rate" means the highest "prime rate" of interest published in *The Wall Street Journal* from time to time in effect, on a floating per annum basis, changing effective immediately on the publication of each change in the "prime rate." If *The Wall Street Journal* fails or discontinues publishing a "prime rate," then the Prime Rate means the base or prime rate the Payee announces, from time to time. The Prime Rate is not necessarily the best or lowest rate charged by the Payee. The Payee is not required to give notice of a change in the Prime Rate. Interest shall be calculated for the actual number of days elapsed, using a daily rate determined by dividing the annual rate by 360. All principal, interest and other amounts which are due but unpaid hereunder shall bear interest, payable on demand, computed at a rate equal to 5.00% per annum plus the rate otherwise payable hereunder. All amounts payable on this Note shall be payable in lawful money of the United States of America.

This Note constitutes the Note issued under the Postpetition Credit Agreement dated as of November __, 2017 (the "Agreement") between the Maker and the Payee, to which Agreement reference is hereby made for a statement of the terms and conditions on which loans in part evidenced hereby were or may be made, and for a description of the conditions upon which this Note may or must be prepaid, in whole or in part, or its maturity accelerated.

This Note is secured by and entitled to the benefit of all of the Postpetition Collateral Documents referred to in the Agreement and all other existing and future mortgages and security agreements between the Maker and the Payee.

This Note is governed by the internal laws of the State of Illinois, without regard to its conflicts of law provisions, except to the extent superseded by federal law.

[Signature page follows]

IN WITNESS WHEREOF, the Maker has caused this Note to be duly executed by its proper and duly authorized officers as of the day and year first above written.

**TEC-AIR, INC.**,
an Illinois corporation


By: _____
Name: Robert J. McMurtry
Its: President

**<u>Exhibit 2</u>**

**Budget**

TEC-Air
Weekly Cash Flow

| Week | actual 10/29-11/3 Week 1 | actual 11/6-11/10 Week 2 | actual 11/13-11/17 Week 3 | actual 11/20-11/24 Week 4 | actual 11/27-12/1 Week 5 | projected 12/4-12/8 Week 6 | projected 12/11-12/15 Week 7 | projected 12/18-12/22 Week 8 | projected 12/25-12/29 Week 9 | projected 1/1-1/5/18 Week 10 | projected 1/8-1/12 Week 11 | projected 1/15-1/19 Week 12 | projected 1/22-1/26 Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** (Subject to +/- 10% Variance) | | | | | | | | | | | | | |
| Beginning Book Balance | ($108,360) | ($227,974) | $162,715 | $456,275 | $170,892 | $214,694 | $346,698 | $379,564 | $470,638 | $180,223 | $616,381 | $372,254 | $108,408 |
| Sales | $85,834 | $565,849 | $437,919 | $114,159 | $150,000 | $469,519 | $200,000 | $150,000 | $150,000 | $190,000 | $100,000 | $100,000 | $150,000 |
| DIP Financing | $0 | | | | $100,000 | | | | | | | | |
| **TOTAL RECEIPTS** | ($22,426) | $337,875 | $600,653 | $570,434 | $420,892 | $684,213 | $446,698 | $629,564 | $545,456 | $370,223 | $616,381 | $472,254 | $408,408 |
| **OPERATING DISBURSEMENTS** Classification | | | | | | | | | | | | | |
| Credit Card Charges | $11,500 | $0 | $0 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 | $18,140 |
| Payroll and Related | $38,790 | $85,102 | $38,780 | $89,213 | $34,489 | $85,000 | $36,000 | $89,645 | $89,645 | $85,000 | $89,645 | $89,645 | $36,000 |
| Equipment/IT | $1,369 | $0 | $0 | $56,544 | $55,000 | $0 | $0 | $56,544 | $56,544 | $0 | $56,544 | $56,544 | $56,000 |
| Insurance | $12,156 | $0 | $0 | $58,969 | $0 | $0 | $0 | $58,969 | $58,969 | $0 | $58,969 | $58,969 | $55,000 |
| Rent | $0 | $0 | $43,843 | $0 | $0 | $43,843 | $0 | $43,843 | $43,843 | $0 | $43,843 | $43,843 | $0 |
| Utilities | $7,936 | $0 | $0 | $28,590 | $0 | $0 | $0 | $28,590 | $28,590 | $0 | $28,590 | $28,590 | $0 |
| Vendors | $133,797 | $90,058 | $61,756 | $158,586 | $116,709 | $208,672 | $231,134 | $99,694 | $99,694 | $98,495 | $107,927 | $156,614 | $0 |
| **TOTAL OPERATING DISBURSEMENTS** | $205,549 | $175,160 | $144,378 | $360,043 | $206,247 | $337,515 | $287,134 | $345,456 | $345,456 | $185,459 | $449,307 | $469,346 | $91,000 |
| **RESTRUCTURING** | | | | | | | | | | | | | |
| Lenders Bank - Adequate Protection | | | | $26,000.00 | | | | | $24,000.00 | | | | $24,000.00 |
| DIP Loan - Interest | | | | | | $5,000.00 | | $5,000.00 | | | | $5,000.00 | |
| Bankruptcy Counsel (Cullen & Dykman)* | | | | | | | $125,000 | | $125,000 | | | | $125,000 |
| US Trustee Fee | | | | | | | | | | | | | $10,400 |
| Three Twenty-One Capital Partners | | | | $5,000 | | | | | | | | | |
| Committee Counsel (Shaw Fishman)* | | | | | | | | $50,000 | $50,000 | | | | $50,000 |
| Ordinary Course Professionals | | | | $8,500.00 | | | $8,500 | $8,500 | $8,500 | | $8,500.00 | $8,500 | $8,500 |
| **TOTAL RESTRUCTURING EXPENSES** | $0 | | | $39,500 | | | $289,134 | $13,500 | $199,000 | $0 | $390,455 | $13,500 | $209,400 |
| **ENDING CASH** | ($227,974) | $162,715 | $456,275 | $170,892 | $214,694 | $346,698 | $379,564 | $470,638 | $180,223 | $616,381 | $472,254 | $154,408 | $91,000 |

*Fees are accrued until closing of sale transaction.